**UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA**

---

UNIVAC DENTAL COMPANY, and
LACTONA CORPORATION

                    Plaintiffs,

v.

DENTSPLY INTERNATIONAL,
INC.,

                    Defendant.

Civil Action No. 1: CV-07-0493
Hon. Christopher C. Conner

Filed Electronically

---

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT**

Paul R. Braunsdorf
*Attorneys for Univac Dental Company*
HARRIS BEACH PLLC
99 Garnsey Road
Pittsford, New York 14534
(585) 419-8800

Bart D. Cohen
*Attorneys for Lactona Corporation*
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, Pennsylvania, 19103
(215) 875-3000

# TABLE OF CONTENTS

<u>Page</u>

TABLE OF AUTHORITIES ........................................................................ ii

INTRODUCTION ...................................................................................... 1

STATEMENT OF FACTS .......................................................................... 2

QUESTION PRESENTED........................................................................... 5

ARGUMENT    BECAUSE A PREVIOUS ACTION INVOLVING
DENTSPLY    CONCLUSIVELY    RESOLVED
MULTIPLE ISSUES PRESENT IN THE CASE AT
BAR,   THE   DOCTRINE   OF   COLLATERAL
ESTOPPEL   PREVENTS   DENTSPLY   FROM
LITIGATING THESE ISSUES AGAIN ........................... 6

    A.    Market Definition and Monopoly Power .................................... 9

    B.    Dentsply's Anticompetitive Retention of Monopoly Power.... 11

    C.    Effect on Universal.................................................................. 14

    D.    Dentsply's Business Justification............................................. 16

CONCLUSION ......................................................................................... 17

# TABLE OF AUTHORITIES

Page

## Cases

*Bd. of Trs. of Trucking Employees of N. Jersey Welfare Fund, Inc.*
 *v. Centra*, 983 F.2d 495 (3d Cir. 1992) ................................................... 7, 8

*Del. River Port. Auth. v. FOP, Penn-Jersey Lodge 30*,
 290 F.3d 567 (3d Cir. 2002) .................................................. 7, 8

*Eastman Kodak Co. v. Image Technical Servs., Inc.*,
 504 U.S. 451 (1992) ......................................................... 8, 9, 11

*Parklane Hosiery v. Shore*, 439 U.S. 322 (1979) ........................................... 6

*Rider v. Pennsylvania*, 850 F.2d 982 (3d Cir. 1988) ...................................... 6

*United States v. Brown Univ.*, 5 F.3d 658 (3d Cir. 1993) ............................. 16

*United States v. Dentsply Int'l, Inc.*, 277 F. Supp. 2d 391
 (D. Del. 2003) ...................................................................... passim

*United States v. Dentsply Int'l, Inc.*, 399 F.3d 181
 (3d Cir. 2005) ...................................................................... passim

*United States v. Mendoza*, 464 U.S. 154 (1984) ............................................ 6

*Vident v. Dentsply Int'l, Inc.*, SA 06-CV-1141, 2008 WL 4384124
 (C.D. Cal. June 5, 2008) ......................................................... 6, 9

## Statutes

15 U.S.C. § 16(a) ....................................................................... 1, 2

## INTRODUCTION

On March 15, 2007, Univac Dental Company ("Univac") filed this action against Dentsply International, Inc. ("Dentsply") alleging violations by Dentsply of Section 2 of the Sherman Antitrust Act, which caused damages to Univac.  On April 25, 2007, Lactona Corporation ("Lactona") filed a similar action.  The actions were consolidated by order dated March 14, 2009.

Dentsply, which for some time held a monopoly position in the market for the sale of artificial teeth, used its monopoly power to foreclose competitors from accessing the dealer network essential to competing effectively in that market. *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181 (3d Cir. 2005) ("*Dentsply II*"), *reversing* 277 F. Supp. 2d 391 (D. Del. 2003) ("*Dentsply I*").  At the time of Dentsply's anticompetitive activity, Univac and Lactona (referred to hereafter as "plaintiffs") were joined as one company selling artificial teeth under the name Universal Dental Company ("Universal").  Following a lengthy non-jury trial and an appeal, Dentsply's actions were found to violate Section 2 of the Sherman Act, 15 U.S.C. § 2.  Plaintiffs now seek to recover the damages they suffered as a result of Dentsply's unlawful monopolistic activity.

The final judgment in *Dentsply II* is "*prima facie* evidence" that Dentsply's activity was anticompetitive.  15 U.S.C. § 16(a).  Dentsply, having had a full and fair opportunity to litigate certain issues in *Dentsply I* and *Dentsply II*, should be

precluded from re-litigating these issues in the case at bar. *Id.* Plaintiffs now move for partial summary judgment and seek an order, based on the doctrine of offensive collateral estoppel, barring Dentsply from litigating in this action those issues decided in *Dentsply I* and *Dentsply II*.

## STATEMENT OF FACTS

In *Dentsply II*, the United States successfully argued that Dentsply illegally maintained a monopoly under Section 2 of the Sherman Act. The facts that led to this suit are detailed in the two opinions in that case. *See Dentsply I and II*. The facts that follow come from these two opinions.

Dentsply is the largest seller of artificial teeth in the United States - about 15 times larger than its next closest competitor - and is one of the largest dental product manufacturers in the United States. *Dentsply II*, 399 F.3d at 184. Dentsply sells premium artificial teeth through its Trubyte division. *Dentsply I*, 277 F. Supp. 2d at 391. It also sells other dental equipment, and in 2002 it sold more than $400,000,000 of products other than teeth to its network of 23 authorized dealers. *Dentsply II*, 399 F.3d at 185. On a revenue basis, Dentsply held a 75% - 80% share of the market for the sale of artificial teeth. *Id.* at 184, 188. The Third Circuit concluded that this share established *prima facie* evidence of Dentsply's power to exclude other competitors from the artificial teeth market. *Id.* at 188.

Artificial teeth are sold by manufacturers such as Dentsply and Universal to a network of national and regional dealers. In turn, the dealers sell the teeth primarily to dental laboratories that incorporate them into dentures and other end products. *Id.* The Third Circuit concluded that it is not possible for a manufacturer to compete effectively in the artificial teeth market absent access to the dealer network. *Id.* at 192-93.

Universal competed with Dentsply for the sale of artificial teeth. *Id.* at 184. The Delaware District Court and the Third Circuit both identified Universal as one of the "significant manufacturers" in the sale of artificial teeth. *Id.*; *Dentsply I*, 277 F. Supp. 2d at 393. Universal was the fifth largest artificial tooth manufacturer in 2002. *Dentsply II*, 399 F.3d at 184.

In 1993, Dentsply put into writing a policy which had been in place and enforced since at least 1988 that required all of its dealers to comply with a written list of "Dealer Criteria" if they wished to deal with or continue to deal with Dentsply. *Dentsply I*, 277 F. Supp. 2d at 412-15; *see Dentsply II* at 185. One of the criteria in particular, Dealer Criterion 6, severely hampered competitors' access to dealers in the artificial teeth market. *Id.* Dealer Criterion 6 stated that "dealers that are recognized as authorized distributors may not add further tooth lines to their product offering." *Id.* Therefore, under Dealer Criterion 6, Dentsply's authorized dealers were prohibited from selling teeth offered by Universal unless

they were already doing so when the Criterion was adopted. *Id.* If a dealer were to violate Dealer Criterion 6, the dealer faced the loss of all of Dentsply's business. *Id.* Because of Dentsply's dominant market power, "no dealer [had] agreed to walk away from its Trubyte business to take on a competitive line." *Id.* at 413. For example, DLDS added teeth made by Universal and Vita, another Dentsply competitor, to meet customers' requests but dropped them after Dentsply threatened to stop supplying its products to DLDS. *Dentsply II*, 399 F.3d at 194.

Dentsply argued that Dealer Criterion 6 was not anticompetitive, and it attempted to justify Dealer Criterion 6 by saying that it was in place to prevent "free riding" by competitors on Dentsply's promotional efforts. *Dentsply I*, 277 F. Supp. 2d at 440-48. In rejecting that argument as pretextual, the District Court found that the express purpose of Dealer Criterion 6 was to "exclude competitors from dealers and not to focus dealers or protect Dentsply's investment in promoting artificial teeth." *Id.* at 453.

Despite finding Dentsply's justification to be pretextual, the District Court ultimately decided in Dentsply's favor. *Id.* at 453-54. The Court ruled that because other competitors could sell directly to the dental laboratories, Dentsply was not unlawfully restricting market access. *Id.* at 450-52. The District Court also concluded that the business decisions of Vita and Ivoclar, two of Dentsply's

largest competitors, were directly responsible for their lack of success. *Id.* at 425-26.

In reversing the District Court, the Third Circuit concluded that bypassing the dealers and selling directly to laboratories was not a realistic alternative. *Dentsply II*, 399 F.3d at 196. The Third Circuit explained that "Dentsply's grip on its 23 authorized dealers effectively choked off the market for artificial teeth, leaving only a small sliver for competitors." *Id.* at 196. Because Dentsply had monopoly power, exercised that power in an anticompetitive manner, and lacked a valid business justification for doing so, the Third Circuit concluded that Dentsply's conduct violated Section 2 of the Sherman Act. *Id.* at 181-97.

Plaintiffs filed this action against Dentsply based in part on the conduct found unlawful in *Dentsply II*. Because Dentsply already litigated all of the issues related to a Section 2 claim in *Dentsply I* and *Dentsply II*, the doctrine of collateral estoppel precludes Dentsply from litigating those issues again.

## QUESTION PRESENTED

Should Dentsply be collaterally estopped from litigating issues relating to plaintiffs' claims under Section 2 of the Sherman Act when those issues have been determined against Dentsply in the action brought against it by the United States?

**ARGUMENT**

**BECAUSE A PREVIOUS ACTION INVOLVING DENTSPLY CONCLUSIVELY RESOLVED MULTIPLE ISSUES PRESENT IN THE CASE AT BAR, THE DOCTRINE OF COLLATERAL ESTOPPEL PREVENTS DENTSPLY FROM LITIGATING THESE ISSUES AGAIN.**

Under the doctrine of collateral estoppel, also known as issue preclusion, "once a court has decided an issue of fact or law necessary to its judgment, that decision is conclusive in a subsequent suit based on a different cause of action involving a party to the prior litigation." *United States v. Mendoza*, 464 U.S. 154, 158 (1984); *Rider v. Pennsylvania*, 850 F.2d 982, 989 (3d Cir. 1988) (issue preclusion "embodies the principle that later courts should honor the first actual decision of a matter that has actually been heard and litigated"). There is no requirement of "mutuality of parties," and the doctrine of collateral estoppel may be used offensively by a non-party to a prior lawsuit. *Mendoza*, 464 U.S. at 158; *Parklane Hosiery v. Shore*, 439 U.S. 322, 324, 326-33 (1979) (recognizing legitimacy of non-mutual offensive collateral estoppel as applied to give preclusive effect to a previous federal court judgment).

The doctrine of offensive collateral estoppel already has been used against Dentsply in a case brought by Vident, another competitor of Dentsply, which brought suit following the judgment against Dentsply in the action brought by the United States. *See Vident v. Dentsply Int'l, Inc.*, SA 06-CV-1141, 2008 WL

- 6 -

4384124, at *1 (C.D. Cal. June 5, 2008). The Court there concluded that Dentsply was collaterally estopped from litigating numerous issues which had been decided by the District Court in *Dentsply I* and by the Third Circuit in *Dentsply II*. *Id.*

The collateral estoppel doctrine bars litigation of an issue adjudicated in an earlier proceeding if: "(1) the identical issue was decided in a prior adjudication; (2) there was a final judgment on the merits; (3) the party against whom the bar is asserted was a party or in privity with a party to the prior adjudication; and (4) the party against whom the bar is asserted had a full and fair opportunity to litigate the issue in question." *Del. River Port. Auth. v. FOP, Penn-Jersey Lodge 30*, 290 F.3d 567, 574 (3d Cir. 2002); *Bd. of Trs. of Trucking Employees of N. Jersey Welfare Fund, Inc. v. Centra*, 983 F.2d 495, 505 (3d Cir. 1992). Because all four elements are satisfied in this case, Dentsply is collaterally estopped with respect to the issues that were necessary to the Third Circuit's finding in *Dentsply II*.

Elements two and three are easily satisfied. Dentsply is the same defendant as in *Dentsply I* and *II*. Further, the Third Circuit in *Dentsply II* reached a final determination on the merits.

The other two collateral estoppel elements are also satisfied here. The factual and legal issues on which plaintiffs seek collateral estoppel are identical to those litigated in *Dentsply I* and *II*, and Dentsply had a full and fair opportunity to

litigate those issues. *See Del. River Port Auth.* 290 F.3d at 574; *Centra,* 983 F.2d at 505.

Plaintiffs allege violations under Section 2 of the Sherman Act. This is the same claim the United States made in *Dentsply I* and the only claim the United States appealed to the Third Circuit. *Dentsply I,* 277 F. Supp. 2d at 390; *Dentsply II,* 399 F.3d at 184. "The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *See Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 480-81 (1992); *see also Dentsply II,* 399 F.3d at 186.

The elements that plaintiffs need to prove to sustain their Section 2 claim are identical to those proved in *Dentsply I* and *II.* These elements were fully and fairly litigated by Dentsply in that case, ending in a final judgment against Dentsply. Dentsply had a full and fair opportunity to litigate these identical issues in the District Court and the Third Circuit. In fact, such an opportunity can consist of much less than a full trial. In *Centra,* the Court held that arguing a motion constituted a full and fair opportunity. *Centra,* 983 F.2d at 505. It follows that when there has been a trial and an appeal, there has been a full and fair opportunity

to litigate.   Therefore, all four prongs of the doctrine of collateral estoppel are satisfied.

The issues set forth below dealing with market definition and monopoly power, anticompetitive retention of a monopoly, effect on Dentsply's competitors, and Dentsply's business justifications are the very issues necessary to the Third Circuit's decision in *Dentsply II*.   The doctrine of collateral estoppel prevents Dentsply from litigating these issues a second time.

Dentsply knew the significance of the suit brought by the United States, and Dentsply knew that by losing it would be subject to collateral estoppel in private litigation brought by other manufacturers.   As noted above, Dentsply has been found by the Central District of California in a suit brought by Vident, another Dentsply competitor, to be collaterally estopped from addressing these very issues. *See Vident*, 2008 WL 4384124, at *1.  Dentsply was given a chance to litigate fully the following against the United States.

A.    **Market Definition and Monopoly Power**

The first element of a Section 2 claim is possession of monopoly power in the relevant market. *Eastman Kodak*, 504 U.S. at 481.  The following issues litigated in *Dentsply I* and *II* establish the relevant market in this case and that Dentsply had monopoly power within that market.  Under the doctrine of collateral estoppel, Dentsply is barred from relitigating the following:

*Market Definition and Dentsply's Market Share*

**Finding 1:**   The "relevant market... is the sale of artificial teeth in the United States both to laboratories and to the dental dealers." *Dentsply II,* 399 F.3d at 188.

**Finding 2:**   "Dentsply has long dominated the industry...and enjoys a 75-80% market share on a revenue basis," 67% on a unit basis and is about 15 times larger than its next closest competitor. *Id.* at 184. "Dentsply's share of the market is more than adequate to establish a prima facie case of power [to exclude]." *Id.* at 188.

**Finding 3:**   Dentsply's tooth business has been highly profitable and can be described as a "cash cow" business, one which has "achieved a relatively high market share in a low- or no-growth market." *Dentsply I,* 277 F. Supp. 2d at 422-23.   Dentsply's profits since 1990 increased 32% from $16.8 million to over $22.2 million in 1996. *Id.* at 423.

*Dentsply's Power to Exclude*

**Finding 4:**   "Dentsply has held its dominant share [of the market] for more than ten years and has fought aggressively to maintain that imbalance." *Dentsply II,* 399 F.3d at 188.

**Finding 5:**   "The evidence demonstrated conclusively that Dentsply had supremacy over the dealer network and it was at that crucial point in the distribution chain that monopoly power over the market for artificial teeth was established.   The reality in this case is that the firm that ties up the key dealers rules the market." *Id.* at 190.

**Finding 6:**   "The reality is that over a period of years, because of Dentsply's domination of dealers, direct sales have not been a practicable alternative for most manufacturers.   It has not been so much the competitors' less than enthusiastic efforts at competition that produced paltry results, as it is the blocking of access to the key dealers.   This is the part of the real market that is denied to the rivals.   The apparent lack of aggressiveness by competitors is not a matter of apathy, but a reflection of the effectiveness of Dentsply's exclusionary policy." *Id.* at 189.

**Finding 7:**   On the basis of the foregoing, Dentsply possesses monopoly power in the relevant market. *Id.* at 187-91.

The market definition and monopoly findings, which are elements of plaintiffs' suit, are identical to the issues litigated in *Dentsply I and II*. These issues were fully and fairly litigated by Dentsply. The parties argued extensively about the definition of the market, Dentsply's share of the market, and Dentsply's power to exclude competitors. *Id.* at 187-91. Proof of Dentsply's monopoly power was a necessary element of the United States' Section 2 claim. *Id.* at 186. Therefore, under the doctrine of collateral estoppel, Dentsply is prohibited from relitigating the definition of the relevant market or the fact that Dentsply has monopoly power in that market.

## B.    Dentsply's Anticompetitive Retention of Monopoly Power

The second element in a Section 2 case is whether there has been "willful acquisition or maintenance of that power," *i.e.*, whether the defendant maintained monopoly power through anticompetitive means. *Eastman Kodak*, 504 U.S. at 481. The following issues litigated in *Dentsply I and II* establish that Dentsply engaged in anticompetitive conduct in retaining its monopoly. Under the collateral estoppel doctrine, Dentsply is barred from relitigating the following issues which were already fully and fairly litigated:

> **Finding 8:** "[L]aboratories are driven by the realities of the marketplace to buy far more heavily from dealers than manufacturers." *Dentsply II*, 399 F.3d at 192. These realities include the fact that dealers offer "beneficial services, credit function, economies of scale and convenience that dealers provide to laboratories, benefits which are otherwise unavailable to them

when they buy direct" *Id.* "The reality in this case is that the firm that ties up the key dealers rules the market." *Id.* at 190.

**Finding 9:**   Dealers provide more marketplace exposure and sales representative coverage than manufacturers can generate on their own. *Id.* at 193. "Using select high-volume dealers, as opposed to directly selling to hundreds if not thousands of laboratories, greatly reduces the manufacturer's distribution costs and credit risks." *Id.*

**Finding 10:**  It was not a viable option for Dentsply's competitors to sell directly to dental laboratories. *Id.* at 193. "The undeniable reality...is that dealers have a controlling degree of access to the laboratories," which makes sales to dealers the only practical or feasible distribution channel. *Id.* The miniscule market shares of Dentsply competitors shows that such direct sales pose little threat to Dentsply. *Id.*

**Finding 11:**  Beginning in at least 1988, Dentsply had in place a policy precluding its dealers from carrying competitive lines of teeth, and it enforced this policy with respect to Frink Dental in 1988 and Zahn Dental that same year. *Dentsply I,* 277 F. Supp. 2d at 413-15; *see also Dentsply II,* 399 F.3d at 185.

**Finding 12:**  The Dentsply policy was put into writing starting in 1993. *Dentsply* I, 277 F. Supp. 2d at 412. The result of the written policy was that each dealer who did business with Dentsply was governed by a series of dealer criteria the dealer was required to follow. *Id.* These dealer criteria included a policy, embodied in Dealer Criterion 6, that discouraged Dentsply's dealers from adding competitors' teeth to their lines of products. *Dentsply II,* 399 F.3d at 185. Dealer Criterion 6 stated: "In order to effectively promote Dentsply/York products, dealers that are recognized as authorized distributors may not add further tooth lines to their product offering." *Dentsply I,* 277 F. Supp. 2d at 412.

**Finding 13:**  "By ensuring that the key dealers offer Dentsply teeth either as the only or dominant choice, Dealer Criterion 6 has a significant effect in preserving Dentsply's monopoly." *Id.* at 191. Dealer Criterion 6 "helps keep sales of competing teeth below the critical level necessary for any rival to pose a real threat to Dentsply's market share. As such, Dealer Criterion 6 is a solid pillar of harm to competition." *Id.*

**Finding 14:** Dealer Criterion 6 also had an anticompetitive effect because it limited the choices of products open to dental laboratories, the ultimate users. *Id.* at 194. Because of Dealer Criterion 6, a "dealer locked into the Dentsply line is unable to heed a request for a different manufacturers' product and, from the standpoint of convenience, that inability to some extent impairs the laboratory's choice in the marketplace." *Id.*

**Finding 15:** "In enforcing Dealer Criterion 6, Dentsply has done more than announce its intent to terminate a dealer found to be in violation. It has monitored compliance with the criterion." *Dentsply I*, 277 F. Supp. 2d at 414-15.

**Finding 16:** Even though Dentsply was having problems for several months during 2000 supplying teeth to dealers, Dentsply enforced Dealer Criterion 6 against a dealer who attempted to switch to a competitor's teeth. *Dentsply I*, 277 F. Supp. 2d at 417.

**Finding 17:** Dentsply's power over the dealers presented significant barriers to entry into the marketplace. *Dentsply II*, 399 F.3d at 194. It was not "realistic" to conclude that "any new or existing manufacturer may 'steal' a Dentsply dealer by offering a superior product at a lower price" as such efforts "have been thwarted by Dentsply's longtime, vigorous and successful enforcement actions." *Id.*

**Finding 18:** "Criterion 6 imposes an 'all-or-nothing' choice on the dealers. The fact that dealers have chosen not to drop Dentsply teeth in favor of a rival's brand demonstrates that they have acceded to heavy economic pressure." *Id.* at 196.

**Finding 19:** The market for artificial teeth is not dynamic or volatile and there are no proven alternative distribution channels. *Id.*

**Finding 20:** "Dentsply's grip on its 23 authorized dealers effectively choked off the market for artificial teeth, leaving only a small sliver for competitors." *Id.*

**Finding 21:** "Dealer Criterion 6 created a strong economic incentive for dealers to reject competing lines in favor of Dentsply's teeth." Id. at 195. Moreover, Dentsply added certain dealers for the specific purpose of blocking competitors from key distribution points. *Id.*

**Finding 22:** "On several occasions, Dentsply has required dealers to drop some, or all, competing tooth brands in order to obtain the Trubyte tooth line in the first place." *Dentsply I*, 277 F. Supp. 2d at 413.

**Finding 23:** There were ten separate incidents detailed by the District Court "in which Dentsply required agreement by new as well as long-standing dealers not to handle competitors' teeth." *Dentsply II*, 399 F.3d at 190. This included a situation involving DLDS which "considered adding two other tooth lines because of customers' demand [after which] Dentsply threatened to sever access not only to the teeth, but to other dental products as well. DLDS yielded to that pressure." *Id.*

These findings of anticompetitive actions which had a major effect on the artificial tooth market are also elements that plaintiffs need to prove. They are identical to the issues in *Dentsply I* and *II*. Showing anticompetitive retention of a monopoly was a necessary element of the United States' Section 2 claim. *Id.* at 186. Dentsply should be collaterally estopped from relitigating the issues of whether its activities were anticompetitive. They were anticompetitive, and Dentsply had a full and fair opportunity to litigate them.

### C.   Effect on Universal

In *Dentsply II*, the Third Circuit focused on the harm to competitors when determining that Dentsply's actions violated Section 2 of the Sherman Act. *Id.* at 196. To succeed in this action, plaintiffs must show that they suffered antitrust injury as a result of Dentsply's violation. In *Dentsply II*, the Third Circuit found a direct effect on Dentsply's competitors, including Universal. Therefore, Dentsply is not allowed another chance to show that its actions did not negatively affect

Universal. Under the doctrine of collateral estoppel, Dentsply is barred from

relitigating the following issues which were already fully and fairly litigated:

> **Finding 24:** Universal competed with Dentsply in the sale of artificial teeth in the United States. *Dentsply II*, 399 F.3d at 184.

> **Finding 25:** The inability of Dentsply's competitors to obtain a larger share of the market was attributable more to Dentsply's "blocking of access to the key dealers" through effective exclusionary policies than to its competitors' own business decisions. *Id.* at 189. "The apparent lack of aggressiveness by [Dentsply's] competitors is not a matter of apathy, but a reflection of the effectiveness of Dentsply's exclusionary policy." *Id.*

> **Finding 26:** Dealer Criterion 6 ensured that key dealers offered Dentsply teeth either as the only or dominant choice, and thus had "a significant effect in preserving Dentsply's monopoly" by keeping "sales of competing teeth below the critical level necessary for any rival to pose a real threat to Dentsply's market share. As such, Dealer Criterion 6 is a "solid pillar of harm to competition." *Id.* at 191.

> **Finding 27:** Dentsply enforced Dealer Criterion 6 specifically to prevent Dentsply's competitors from having access to a dealer network. *Id.* at 194-195. Because of Dealer Criterion 6, DLDS dropped Universal's teeth when Dentsply threatened to stop supplying its product. *Id.* at 194.

> **Finding 28:** Dentsply maintained its monopoly anticompetitively through Dealer Criterion 6 and exercised its monopoly power to prevent competitors, including Universal, from competing effectively. *Id.* at 191-96.

The facts establishing harm to Dentsply's competitors, including Universal,

are identical issues to those that were fully and fairly litigated in a previous action

in which Dentsply was a party and which went to a final judgment. Harm to

competition was a necessary part of the United States' Section 2 claim and

therefore was fiercely litigated by both sides. Dentsply is estopped from disputing

that it maintained its monopoly through anticompetitive means, thereby causing

harm to competition, as it already had a full and fair opportunity to argue this issue.

### D.    Dentsply's Business Justification

A defendant accused of violating Section 2 may attempt to offer pro-

competitive justifications for its challenged conduct. *United States v. Brown Univ.*,

5 F.3d 658, 669 (3d Cir. 1993).    Dentsply attempted to do this in the earlier

litigation, and both the District Court and the Third Circuit expressly rejected these

justifications as pretextual. *Dentsply I*, 277 F. Supp. 2d at 453; *Dentsply II*, 399

F.3d at 196-97.    Under the collateral estoppel doctrine, Dentsply is barred from

relitigating the following issue which was already fully and fairly litigated:

> **Finding 29:** "Dentsply's alleged justification was pretextual and did not
> excuse its exclusionary practices." *Dentsply II*, 399 F.3d at 197.
> "Dentsply's asserted justifications for its exclusionary policies are
> inconsistent with its announced reason for the exclusionary policies, its
> conduct enforcing the policy, its rival suppliers' actions, and dealers'
> behavior in the marketplace." *Id*. at 196-97.    Dentsply's claimed
> justification was inconsistent with the evidence establishing that Dentsply's
> express purpose in enacting and enforcing Dealer Criterion 6 was
> anticompetitive—to "block competitive distribution points" and "tie up
> dealers." *Id*. at 189.

In *Dentsply I* and *Dentsply II*, Dentsply tried and failed to establish the

above reasons as justifying the imposition of Dealer Criterion 6.    Both the District

Court and the Third Circuit found these alleged reasons to be pretextual. *Dentsply*

*I*, 277 F. Supp. 2d at 453; *Dentsply II*, 399 F.3d at 196-97.    As the Third Circuit

said at the end of its analysis of Dentsply's alleged business justification, the

- 16 -

"record amply supports the District Court's conclusion that Dentsply's alleged justification was pretextual and did not excuse its exclusionary practices." *Dentsply II*, 399 F.3d at 197. Dentsply is thus estopped from arguing in the case at bar that its conduct was justified by a legitimate business reason.

## CONCLUSION

In defending the Section 2 claim brought by the United States, Dentsply argued extensively about the definition of the relevant market, its monopoly power, its anticompetitive policies, the effect of those policies on its competitors, and Dentsply's purported justifications for those policies. After two opinions on the relevant issues, one more than 50 pages, the Third Circuit found those arguments without merit. These issues that were extensively litigated are identical to the issues on which plaintiffs must prevail to succeed on their Section 2 claim. Therefore, they are now entitled, under the doctrine of collateral estoppel, to the preclusive effects of those determinations.

June 22, 2009                          Respectfully submitted,

s/Paul R. Braunsdorf                   s/Bart D. Cohen/PRB
Paul R. Braunsdorf                     Bart D. Cohen
HARRIS BEACH PLLC                      BERGER & MONTAGUE, P.C.
*Attorneys for Univac Dental Company*  *Attorneys for Lactona Corporation*
99 Garnsey Road                        1622 Locust Street
Pittsford, New York 14534              Philadelphia, Pennsylvania, 19103
(585) 419-8800                         (215) 875-3000

226660 1198818.18