IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| UNIVAC DENTAL COMPANY and LACTONA CORPORATION<br><br>Plaintiffs,<br><br>v.<br><br>DENTSPLY INTERNATIONAL, INC.,<br><br>Defendant. | Civil Action No. 1:07-CV-00493-CCC<br>The Honorable Christopher C. Conner |

## DEFENDANT DENTSPLY INTERNATIONAL, INC.'S
## BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Melissa H. Maxman (PA58009)
Ronald F. Wick (pro hac vice)
BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5304
202.861.1500
202.861.1783 FAX

Counsel for Defendant Dentsply International,
Inc.

# TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................... i

TABLE OF AUTHORITIES ............................................................................. iii

I.      INTRODUCTION AND SUMMARY ....................................................... 1

II.     PROCEDURAL HISTORY .................................................................... 3

III.    STATEMENT OF FACTS ...................................................................... 4

        A.   Dentsply ................................................................................... 4

        B.   Universal .................................................................................. 6

        C.   Distribution of artificial teeth ................................................. 7

        D.   Dealer Criterion 6 .................................................................... 9

        E.   "Tooth swaps" ........................................................................ 11

        F.   Dealer Growth Incentive Program ......................................... 14

        G.   The government litigation ...................................................... 15

        H.   The instant litigation .............................................................. 16

IV.     STATEMENT OF QUESTIONS INVOLVED ......................................... 18

V.      ARGUMENT ....................................................................................... 19

        A.   Summary judgment is favored in antitrust cases .................... 19

        B.   Plaintiffs' claims are time-barred. ......................................... 21

             1.   Plaintiffs' Section 2 claims arising out of Dentsply's
                  exclusivity policy are time-barred. .................................. 23

             2.   Plaintiffs' Section 2 claims arising out of Dentsply's
                  practices other than exclusivity are time-barred. ............. 26

                  a.   The claims were not tolled by the government litigation. . 26

b.   Even if the claims were tolled by the government litigation, they are still time-barred............................ 29

3.    Univac's Pennsylvania law claims are time-barred................. 30

C.   Dentsply's exclusivity policy did not cause antitrust injury to plaintiffs. ........................................................... 31

D.   Dentsply's dealer swaps and incentive rebates did not violate Section 2 of the Sherman Act.......................................... 33

VI.    CONCLUSION ................................................................. 37

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Liberty Lobby,*
477 U.S. 242 (1986)................................................................................20

*Arnold Pontiac-GMC Inc. v. Gen. Motors Corp.,*
786 F.2d 564 (3d Cir. 1985).................................................................19

*Aurora Enters., Inc. v. Nat'l Broad. Co.,*
688 F.2d 689 (9th Cir. 1982) ..............................................................26

*B&H Med., L.L.C. v. ABP Admin., Inc.,*
526 F.3d 257 (6th Cir. 2008) ..............................................................31

*Brown Shoe Co. v. United States,*
370 U.S. 294 (1962)................................................................................31

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
429 U.S. 477 (1977)................................................................................31

*Chernavsky v. Twp. of Holmdel Police Dep't,*
136 F. App'x 507 (3d Cir. 2005) ........................................................20

*DeLong Equip. Co. v. Wash. Mills Abrasive Co.,*
887 F.2d 1499 (11th Cir. 1989) ..........................................................21

*DXS, Inc. v. Siemens Med. Sys., Inc.,*
100 F.3d 462 (6th Cir. 1996) ..............................................................25

*Estate of Beim v. Hirsch,*
121 F. App'x 950 (3d Cir. 2005) ........................................................20

*Gabriel v. O'Hara,*
534 A.2d 488 (Pa. Super. Ct. 1987)..................................................30

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.,*
392 U.S. 481 (1968)................................................................................24

*Harold Friedman Inc. v. Thorofare Markets Inc.,*
587 F.2d 127 (3d Cir. 1978).................................................................25

*Harter v. GAF Corp.,*
967 F.2d 846 (3d Cir. 1992)................................................................20

*Ind. Grocery Inc. v. Super Valu Stores, Inc.,*
864 F.2d 1409 (7th Cir. 1989) ............................................................20

-iii-

*Leh v. Gen. Petroleum Corp.,*
  382 U.S. 54 (1965)..................................................................................... 27

*LePage's Inc. v. 3M,*
  324 F.3d 141 (3d Cir. 2003)................................................................ 34, 35

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
  475 U.S. 574 (1986)..................................................................................... 20

*Novell, Inc. v. Microsoft Corp.,*
  505 F.3d 302 (4th Cir. 2007) ............................................................... 27, 28

*Pa. Dental Ass'n v. Med. Serv. Ass'n,*
  815 F.2d 270 (3d Cir. 1987)...................................................................... 21

*PepsiCo, Inc. v. Coca-Cola Co.,*
  315 F.3d 101 (2d Cir. 2002)....................................................................... 20

*Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.,*
  373 F.3d 57 (1st Cir. 2004)........................................................................ 31

*United States v. Microsoft Corp.,*
  87 F. Supp. 2d 30 (D.D.C. 2000)
  *rev'd in part on other grounds, aff'd in part, & remanded in part,*
  253 F.3d 34 (D.C. Cir. 2001) .................................................................... 31

*Xerox Corp. v. Media Scis. Int'l, Inc.,*
  511 F. Supp. 2d 372 (S.D.N.Y. 2007) ....................................................... 35

*Zenith Radio Corp. v. Hazeltine Research, Inc.,*
  401 U.S. 321 (1971)..................................................................................... 24

**Statutes**

15 U.S.C. § 15b ............................................................................................ 21

15 U.S.C. § 16(i) ..................................................................................... 22, 27

15 U.S.C. § 2 .................................................................................................. 1

42 Pa. C.S. § 5527(b) ................................................................................... 30

42 Pa. C.S. §5524(7) .................................................................................... 30

## I.  INTRODUCTION AND SUMMARY

Defendant Dentsply International, Inc. ("Dentsply") is the leading U.S. manufacturer of prefabricated artificial teeth, which are used primarily by dental laboratories in making dentures.  In 1999, the U.S. Department of Justice filed a civil action against Dentsply, challenging Dentsply's requirement that dental dealers stocking Dentsply teeth not add any competing lines of teeth.  That litigation resulted in a 2003 decision by the District Court that heard the case that Dentsply's policy was not a violation of the antitrust laws.  The government appealed the portion of this decision that held Dentsply's policy lawful under Section 2 of the Sherman Act, 15 U.S.C. § 2, and the U.S. Court of Appeals for the Third Circuit overturned the District Court and held that Dentsply's policy constituted unlawful maintenance of monopoly power in violation of Section 2.

Plaintiffs Univac Dental Company ("Univac") and Lactona Corporation ("Lactona") both claim to be successor in interest to Uni Lac Corporation ("Uni Lac"), which manufactured the Universal brand of artificial teeth in competition with Dentsply.  Plaintiffs claim that Dentsply injured Uni Lac, not only through the dealer exclusivity requirement that was the subject of the government litigation, but also through two other practices that were not part of the government litigation: (i) "tooth swaps," in which Dentsply acquired a dealer's inventory of Universal teeth in exchange for Dentsply teeth, and (ii) rebates offered to exclusive Dentsply

dealers. Plaintiffs claim that these practices, in addition to the exclusivity requirement, violated Section 2 of the Sherman Act. Univac further claims that Dentsply's practices violated Pennsylvania common law.

Plaintiffs' claims are barred by the statute of limitations. Plaintiffs have identified only three instances in which the Dentsply practices complained of affected Universal—one enforcement of the exclusivity policy and two "tooth swaps"—all of which occurred more than four years before the government's action tolled the statute of limitations for Sherman Act claims. Indeed, because the "tooth swaps," and the exclusivity rebates, were not part of the government litigation, plaintiffs are not entitled to the benefit of tolling the statute of limitations with respect to these claims. The statute of limitations applicable to Univac's Pennsylvania claims, which was not tolled at all, likewise does not permit Univac's claims.

In addition, the three episodes of which there is record evidence do not amount to a Section 2 violation. Notwithstanding the Third Circuit's holding that Dentsply's exclusivity requirement violated Section 2, Universal—a longtime manufacturer—was "grandfathered" into many dealers affected by the Dentsply policy and did not or could not suffer antitrust injury. The "tooth swaps" were nothing more than arm's-length negotiations between Dentsply and dealers who sought to facilitate the conversion of their inventory to Dentsply teeth, and there is

no admissible evidence that Dentsply's rebate program caused any dealer to reduce or eliminate its purchases of Universal teeth.

## II.    PROCEDURAL HISTORY

On March 15, 2007, Univac filed the instant Complaint alleging injury under Section 2 of the Sherman Act and Pennsylvania common law. On April 25, 2007, Lactona filed a virtually identical Complaint, alleging injury under Section 2 only. On December 7, 2007, Dentsply filed a counterclaim in interpleader against both Univac and Lactona, seeking resolution as to which of them owned the claim against Dentsply.

On March 14, 2008, the Court granted Dentsply's motion to consolidate the Univac and Lactona actions, close the Lactona action, and transfer it to this action. Also on March 14, the Court denied Dentsply's motion to dismiss Univac's Complaint on statute of limitations grounds. The Court held that because Univac's Complaint had not specified the dates of all of the actions alleged, the validity of Dentsply's statute of limitations was not ascertainable from the face of the Complaint. On June 17, 2008, the Court, denied a similar motion to dismiss Lactona's Complaint as time-barred. Fact discovery followed, and has been completed.

## III.    STATEMENT OF FACTS

### A.    <u>Dentsply</u>

Dentsply manufactures a range of professional dental products that are marketed, distributed, and sold in the United States.  Defendant Dentsply International, Inc.'s Statement of Material Facts at ¶ 1 (hereinafter "SMF ___").  Among those products are prefabricated artificial teeth, which are purchased primarily by dental laboratories for use in making dentures.  SMF 1.

Dentsply was founded in 1899.  SMF 3.  Throughout its history, Dentsply has been a leading innovator of artificial tooth products.  SMF 3.  Dentsply's innovations have included inventing a way to fasten porcelain teeth to dentures; inventing the first mould guide, which allowed the lab technician to use exact measurements to ensure that the teeth in a denture would fit the patient's jaw line; introducing fluorescence to make teeth appear more lifelike; moving the tooth market away from porcelain and toward plastic teeth; and developing IPN (interpenetrating polymer network), the current worldwide industry standard for premium artificial teeth.  SMF 3.  Dentsply also has invested substantially in new manufacturing equipment to produce higher quality and less expensive teeth.  SMF 4.  During the time period relevant to this action, Dentsply spent an average of more than $1 million annually to maintain and/or produce new moulds (shapes),

-4-

and manufacture and designs machine that have helped to automate the moulding process for teeth.  SMF 4.

Dentsply also has been a leader in promoting its brand.  Dentsply has long had the largest sales force dedicated to promoting artificial teeth.  SMF 5.  In addition, although Dentsply sells teeth exclusively through dealers, Dentsply focuses the bulk of its marketing efforts on dental labs, in an effort to generate demand for Dentsply teeth.  SMF 5.  Dentsply's general goal was to have approximately 65 percent of the dedicated tooth sales force's calls made to dental labs.  SMF 5.  Dentsply also streamlined the tooth ordering process by developing the Dentsply Order Network, which allows labs to order teeth on line or over the telephone using a computer with a bar code scanner or a portable data terminal.  SMF 6.  This network enables the lab to refill its inventory by electronically sending its tooth order to the dealer, facilitating the ordering process for both the lab and the dealer.  SMF 6.  Dentsply has further established a significant presence in U.S. dental schools, investing considerable resources to penetrate the schools, familiarize dental students with Dentsply teeth, and generate long-term brand recognition and demand at the dentist level.  SMF 7.

Dentsply's history of innovation and brand promotion has been highly successful.  Dentsply estimates its share of the U.S. artificial tooth market at

around 70 percent.  SMF 8.  Dentsply acknowledges that at all times relevant to this action, it has been the dominant U.S. manufacturer of artificial teeth.  SMF 8.

### B.    Universal

Plaintiffs are both successor companies to Uni Lac Corporation, which manufactured and sold artificial teeth under the Universal brand name beginning in 1980 when it purchased the Universal tooth business from Warner-Lambert Co. SMF 9.  The Universal brand has been in existence since 1917.  SMF 9.

In addition to Universal teeth, Uni Lac also purchased and operated the Lactona line of oral hygiene products, including toothbrushes.  SMF 10.  On January 1, 1997, Uni Lac split into the two companies that are the plaintiffs in this action:  Universal Dental Company, which later became Univac, and Lactona. SMF 11.  Following the split, Universal/Univac continued to operate the Universal tooth brand; Lactona did not participate in the tooth market.   SMF 11.

By the 1980s, according to Uni Lac's former vice president, the Universal brand, like Dentsply, was "well entrenched" with the major dental dealers.  SMF 12.  Nevertheless, Universal tooth sales in the United States began declining steadily from the onset of Uni Lac's ownership of the brand, falling from approximately $2.1 million in 1981 to less than $1.8 million in 1987.  SMF 13.

In 1993, Uni Lac went into bankruptcy.  SMF 14.  After emerging from bankruptcy in 1994, Uni Lac faced substantial difficulty ensuring the confidence of

its Universal tooth dealers, and lost some of those dealers as a result. SMF 14. As

Universal's vice president of sales wrote in an internal memo:

> We continued to put out fires and loose [sic] accounts through June, July of '94 due to the stigma of our bankruptcy. Examples are Thau-Nolde, and P.T. Barber, just to mention the most recent. It has also been a full time job just to get back the confidence of our existing dealers who at least stuck with us during these bad times. Many are still playing a 'wait and see' attitude before they increase their stock levels and make any investment in Universal teeth.

SMF 14.

Universal tooth sales continued to decline both before and after the

Uni Lac split, and Univac ultimately sold the Universal tooth business in

2001. SMF 14.

## C.    Distribution of artificial teeth

Participants in the artificial tooth market fall into one of four categories: (i)

manufacturers, (ii) dealers, (iii) dental laboratories, and (iv) dentists. SMF 15.

Manufacturers participating in the U.S. artificial tooth market historically have

distributed their teeth in one of three ways: (i) directly to dental labs, (ii) through

dental dealers, or (iii) through a hybrid system combining direct sales and sales to

dealers. SMF 16.

There are hundreds of dental dealers operating in the United States. SMF

17. Dental dealers fall into two major categories: laboratory dealers, which carry

products for dental labs and primarily service that customer, and operatory dealers,

which carry products for dentists exclusively or in combination with dental lab products. SMF 17.

National tooth dealers sell teeth nationwide through a network of tooth stock inventories scattered throughout the country. SMF 18. Regional tooth dealers are particularly strong in certain areas of the country and have multiple tooth stocks scattered throughout the states in which they sell. SMF 18. Local, specialty tooth dealers typically operate within a single state or a single city. SMF 18. They are much smaller organizations than national or regional dealers, carry a narrower range of products, and have fewer resources such as catalogs and sales representatives. SMF 18.

Due to the thousands of mould and shade combinations of artificial teeth, most tooth dealers carry large inventories of teeth. SMF 19. A dealer's "tooth counter" is a separate part of a laboratory dealer dedicated almost entirely to handling teeth. SMF 19.

There are thousands of dental labs in the United States that fabricate dentures. SMF 20. Dental labs maintain artificial tooth inventories for use in fabricating dentures. SMF 20. Labs are the relevant consumer for prefabricated artificial teeth because in a majority of cases, they choose the brand of tooth used in a dentures. SMF 21. If the lab has the brand of teeth in stock that it needs to fabricate a denture, it will pull the tooth cards from its inventory; otherwise, it must

-8-

place an order from a dealer or manufacturer. SMF 21. Labs also place periodic orders for teeth to replenish their inventories. SMF 21.

### D.    Dealer Criterion 6

In February 1993, Dentsply distributed a set of ten written criteria to its dealers. SMF 22. Among those criteria was Dealer Criterion 6, which stated: "In order to effectively promote Dentsply/York products, dealers that are recognized as authorized distributors may not add further tooth lines to their product offering." SMF 22. Dentsply did not consider its written criteria to be a new policy, but rather a document memorializing the unwritten policies that had been in effect for several years. SMF 23.

Dentsply's prohibition on its dealers' carrying competitive teeth appears to have been in effect since approximately the mid-1980s. SMF 23. The primary targets of this exclusivity policy were Vita Zahnfabrik ("Vita"), a German manufacturer that sells teeth in the United States through an affiliated importer and distributor named Vident, and Ivoclar Vivadent AG ("Ivoclar"), a Liechtenstein-based manufacturer that sells teeth in the United States through a U.S. subsidiary. SMF 24. In the late 1980s and early 1990s, Vita and Ivoclar were beginning to penetrate the U.S. market, and Dentsply saw them as its two most significant competitors. SMF 25. On at least nine occasions between 1988 and 2001, Dentsply enforced Dealer Criterion 6, or its unwritten predecessor, either to

prevent existing Dentsply dealers from adding Vita and/or Ivoclar teeth or to require new Dentsply dealers to drop Vita and/or Ivoclar teeth as a condition of carrying Dentsply teeth.  SMF 25.

The record reflects only one occasion, however, on which Dentsply enforced Dealer Criterion 6 to prevent a dealer from carrying Universal teeth.  SMF 26.  In early 1994, Dentsply learned that Dental Laboratory Discount Supply ("DLDS") had added the Universal tooth line.  SMF 26.  On May 3, 1994, Dentsply notified DLDS that DLDS would be terminated as a Dentsply dealer.  SMF 26.  DLDS subsequently abandoned its plan to carry Universal teeth and continued as a Dentsply dealer.  SMF 26.

More importantly, because Dealer Criterion 6 prohibited only the addition of new competing lines of teeth, Universal's relationship with its existing dealers was unaffected by Dealer Criterion 6.  SMF 28.  In 1994, more than 77 percent of Dentsply's Trubyte Division sales (teeth and merchandise) were to dealers that had carried Universal teeth since before the issuance of Dealer Criterion 6, and therefore were not foreclosed to Universal.  SMF 28.  Thus, less than 23 percent *of Dentsply's own sales* came from the portion of the market foreclosed to Universal by Dealer Criterion 6.  On at least one occasion, Dentsply required a new dealer to drop competing lines but made an exception for Universal teeth, which the dealer

-10-

was permitted to continue selling "[b]ecause Universal was actually no threat to the Trubyte line." SMF 29.

The dealers into which Universal was grandfathered included the two largest dealers, Patterson Dental Co. ("Patterson") and Zahn Dental Manufacturing ("Zahn"), which between them accounted for nearly one-half of the Trubyte Division's dealer sales in 1994 and 1995. SMF 30. Universal's sales to Patterson and Zahn in 1994 totaled $268,000. SMF 30. Moreover, Universal had the ability to compete with Dentsply to increase its inventories with these dealers, as nothing in Dealer Criterion 6 prevented dealers from increasing their stocks of "grandfathered" tooth lines. SMF 31. Indeed, the president of Zahn testified that Universal and other Dentsply competitors, through poor promotion, had in fact missed an opportunity to increase their sales through Zahn:

> . . . in reality all of the manufacturers that we carry have a much better opportunity if they work with us, to get—convert customers to their lines than Dentsply, because Dentsply is the largest player there. . . . In other words, I work for Universal or Myerson, to me they have not done their job nearly to the extent as Dentsply has done their job.

SMF 31.

### E.    "Tooth swaps"

Dentsply routinely engaged in "tooth swaps" with laboratories. SMF 33. Tooth swaps typically occurred at the end stages of Dentsply's efforts to convert a dental lab from using a competitor's teeth to using Dentsply teeth. SMF 33. When the lab expressed reservations about its existing inventory of the competitor's

-11-

teeth, which might take several months to exhaust, Dentsply would agree to acquire the competing inventory in exchange for an equivalent value of Dentsply teeth. SMF 33.

On rare occasions, Dentsply also has performed tooth swaps with dealers. SMF 34. These swaps may have been initiated by either Dentsply or the dealer and, like the lab swaps, were among the final steps in a dealer's decision to cease carrying the competing line of teeth. SMF 34.

As a condition of the swap, Dentsply typically would require the laboratory or dealer to place an upfront order for an additional, equivalent quantity of Dentsply teeth. (For example, if a dealer wanted to exchange $50,000 of Universal teeth for $50,000 of Dentsply teeth, Dentsply typically would require the dealer to place a purchase order for an additional $50,000 of Dentsply teeth.) SMF 35. Since the transaction would result in Dentsply's having twice as much inventory in the lab's stock as the competitor had had, Dentsply referred to this practice as a "two-for-one swap." SMF 35. There is no evidence of, and Dentsply is unaware of, any tooth swap in which it "overpaid" for a competing inventory teeth, i.e., in which it compensated a dealer or lab with a higher value of teeth than the teeth it was acquiring. SMF 35.

Swaps were frequently initiated at the behest of a dealer or laboratory that wanted to sell Dentsply teeth but sought quick disposal of an existing inventory of

-12-

a competing line of teeth. SMF 36. Dentsply's market power was not essential to its ability to perform the swaps; other manufacturers routinely engaged in swaps in order to gain additional lab business. SMF 36. One dealer testified that swaps were "a very common practice in our industry" and that the manufacturers "all play the same game . . . . They all want market share. If they have to do it by doing a swap-out, they'll do it." SMF 36.

The record reflects only two dealer swaps in which Dentsply obtained Universal teeth. The first occurred in 1990, when Dentsply provided Guggenheim Brothers Dental Supply Company ("Guggenheim") with Dentsply teeth in exchange for Guggenheim's supply of Universal teeth. SMF 37. Guggenheim subsequently notified dental labs that it would no longer stock "Univac" teeth. SMF 37.

The second dealer swap involving Universal teeth occurred in 1993, when Dentsply obtained Benco Dental's ("Benco") Universal inventory. SMF 38. As with Guggenheim, there is no evidence that the Dentsply-Benco swap was anything other than a final step in Benco's decision to terminate its Universal inventory. There is no evidence that any dealer swapped Universal teeth to Dentsply subsequent to the 1993 Benco swap, and Dentsply is unaware of any such subsequent swap. SMF 38.

-13-

## F.    Dealer Growth Incentive Program

One of the methods by which Dentsply sought to increase its sales was the institution of various rebate programs for dealers. SMF 39. The Dealer Growth Incentive Program provided rebates of up to 2 percent of annual sales to all Dentsply dealers, exclusive or nonexclusive, who achieved targeted increases in their annual sales of Dentsply prosthetics products, including teeth. SMF 39. In 1994, Dentsply increased the growth incentive rebate by 50 percent for exclusive Dentsply tooth dealers. SMF 40. The additional rebate for dealers who were exclusive was only 0.5 or 1.0 percent of total sales. SMF 40. Exclusive dealers also received 5 percent net rebates on net purchases of new products for the first six months after the product's introduction. SMF 41.

Although the additional rebate was offered an incentive to encourage nonexclusive Dentsply dealers—i.e., dealers who continued to carry competing tooth lines that were "grandfathered" under Dealer Criterion 6—to drop their competing lines, many Dentsply dealers opted to forgo the additional rebate and remain nonexclusive. SMF 42. The president of the largest dealer, Zahn Dental, testified:

> We want to offer to our customers what they want to buy. So, I think
> it's more important that our customers have a choice, in teeth as well
> as merchandise products. . . . We would obviously like to have the
> extra money, but it hasn't adversely affected us.

SMF 42. There is no evidence that the additional exclusivity rebate induced any

-14-

dealer to drop its "grandfathered" Universal teeth, and Dentsply is unaware of any instance in which this occurred.   SMF 43.

## G.    The government litigation

On January 5, 1999, the U.S. Department of Justice filed an antitrust action against Dentsply in the U.S. District Court for the District of Delaware.  SMF 44. The government alleged that Dealer Criterion 6, and its unwritten predecessor, violated the federal antitrust laws.  SMF 44.  No other antitrust violations were alleged.  SMF 44.

The government's investigation was initiated, at least in part, by complaints from Uni Lac shortly after DLDS dropped Universal in 1994.  SMF 45.  Uni Lac considered filing a private action against Dentsply at that time, but chose not to. SMF 45.

On August 8, 2003, following extensive discovery and a trial, the District Court found that Dentsply had not violated the antitrust laws.  SMF 47.  On February 24, 2005, the U.S. Court of Appeals for the Third Circuit reversed the District Court's decision, holding that Dealer Criterion 6 violated Section 2 of the Sherman Act by foreclosing a significant share of dealers to Dentsply's competitors.  SMF 48.  The Third Circuit cited the District Court's finding of "some ten separate incidents in which Dentsply required agreement by new as well as long-standing dealers not to handle competitors' teeth."  SMF 49.  Only one of

those incidents—the 1994 DLDS incident—involved Universal teeth.   SMF 49.

As a result of the Third Circuit's decision, Dentsply was enjoined from further

enforcement of Dealer Criterion 6.  SMF 50.  A Final Judgment was entered by the

District Court on April 26, 2006.  SMF 50.

## H.    The instant litigation

Univac and Lactona both claim entitlement to damages allegedly incurred by

Uni Lac as a result of various Dentsply practices.  SMF 52.  Lactona's president,

Robert Goglia, testified that Lactona's Complaint is based on (i) Dentsply's

exclusivity policy, which culminated in Dealer Criterion 6; (ii) Dentsply's tooth

swaps with dealers; and (iii) Dentsply's additional growth rebate for exclusive

dealers.  SMF 53.  Mr. Goglia admitted, however, that he "can't honestly say"

whether any of Dentsply's acts about which Lactona complains occurred in or after

1995.  SMF 54.

Univac's president, Anthony Montemurro, blamed Univac's loss of sales to

various dealers on Dentsply, but was consistently unable to identify what he

believed Dentsply did to cause the dealer to reduce its purchases from Universal.

SMF 55.  In its responses to Dentsply's interrogatories, which Mr. Montemurro

verified, Univac identified 10 dealers that it contends stopped selling Universal

teeth as a result of the Dentsply practices and policies alleged in Univac's

Complaint.  SMF 56.  Yet when asked about the circumstances under which

Univac lost these dealers' business, Mr. Montemurro could not—with the exception of the documented DLDS, Benco, and Guggenheim instances described above—support Univac's allegations with any specific facts or dates. SMF 57.

Mr. Montemurro's testimony regarding one of those 10 dealers, Davis Dental, is illustrative. Asked when Davis dropped Universal teeth, Mr. Montemurro replied, "I'm going to guess '94, somewhere around there." SMF 57. Mr. Montemurro then said, "I would say that they stopped in the end of '95, beginning of '96." SMF 57. Then: "I think they were being pressured in '94 to not continue with Universal teeth and then they were finally taken out in '96." SMF 57. Asked about the nature of the "pressure," Mr. Montemurro said that "there was more rebate to be gained by selling just Dentsply teeth and not other lines of teeth." SMF 57. However, when asked whether Dentsply had threatened to terminate Davis if Davis did not terminate Universal, Mr. Montemurro said, "I believe so." SMF 57. Pressed as to whether Davis allegedly terminated because of threats or rebate offers from Dentsply, Mr. Montemurro equivocated: "I still think it was a combination of both. I can't say specifically one more than the other one." SMF 57. As with most dealers, Montemurro admitted he had no first-hand knowledge of the Davis termination, saying he "believed" he learned the specifics from his vice president of sales, who learned them from a sales representative, who learned them from Davis. SMF 57.

Mr. Montemurro, Mr. Goglia, and Uni Lac's former vice president of sales and marketing, Gordon Hagler, all gave similar, vague testimony with respect to each dealer (other than DLDS, Benco, and Guggenheim) on which plaintiffs base their complaints. Although plaintiffs identified these three men as the primary individuals with knowledge of the facts underlying their complaint (SMF 58), none could remember the precise timing or circumstances under which the dealer dropped or reduced its purchases of Universal teeth, none had first-hand knowledge of the termination, and none could explain exactly what unlawful act Dentsply is alleged to have done to any dealer.

## IV.   STATEMENT OF QUESTIONS INVOLVED

A.   Should defendant be granted summary judgment because there is no evidence that it committed any allegedly unlawful act within the applicable limitations period that injured plaintiffs?

Defendant submits that the answer is "Yes."

B.   Should defendant be granted summary judgment as to plaintiffs' allegations that defendant's exclusivity policies unlawfully foreclosed a significant portion of the U.S. artificial tooth market, because those policies foreclosed only a small portion of that market to plaintiffs and thus did not cause antitrust injury to plaintiffs?

Defendant submits that the answer is "Yes."

-18-

C.     Should defendant be granted summary judgment as to plaintiffs'
allegations that (i) defendant occasionally "swapped" its artificial teeth to a tooth
dealer in exchange for the dealer's inventory of a competitor's teeth or (ii)
defendant offered increased rebates to tooth dealers who carried defendant's teeth
exclusively, where there is no evidence of any relationship between the swaps and
defendant's market power or of any dealer that was induced by the increased
rebates to carry defendant's teeth exclusively?

Defendant submits that the answer is "Yes."

## V.     ARGUMENT

### A.     <u>Summary judgment is favored in antitrust cases.</u>

Summary judgment is appropriate when "there is no genuine issue as to any
material fact and the moving party is entitled to judgment as a matter of law." Fed.
R. Civ. P. 56(c). Summary judgment will be granted in the "absence of any
significant probative evidence tending to support the complaint." *Arnold Pontiac-
GMC Inc. v. Gen. Motors Corp.*, 786 F.2d 564, 572 (3d Cir. 1985) (citation
omitted).

In a summary judgment motion, "the burden on the moving party may be
discharged by 'showing'—that is, pointing out to the district court—that there is an
absence of evidence to support the nonmoving party's case when the nonmoving
party bears the ultimate burden of proof." *Estate of Beim v. Hirsch*, 121 F. App'x

950, 953 (3d Cir. 2005) (internal quotations omitted).  The burden then shifts to the nonmoving party to set forth specific facts showing that there is a genuine issue for trial.  *Id.* at 953-54.  "There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Id.* at 954 (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986)).

To meet its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Chernavsky v. Twp. of Holmdel Police Dep't*, 136 F. App'x 507, 509 (3d Cir. 2005) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  Rather, a party opposing summary judgment "must make a showing sufficient to establish the existence of every element essential to his case, based on the affidavits or by the depositions and admissions on file."  *Harter v. GAF Corp.*, 967 F.2d 846, 852 (3d Cir. 1992).

Summary judgment is no less appropriate in antitrust cases than in any other type of case.  "The Supreme Court has emphasized . . . that summary judgment may be especially appropriate in an antitrust case because of the chill antitrust litigation can have on legitimate price competition."  *Ind. Grocery Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1412 (7th Cir. 1989) (citing *Matsushita*, 475 U.S. at 594-95).  *See also PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 104 (2d Cir. 2002) (summary judgment favored in antitrust cases "because of the concern that

-20-

protracted litigation will chill pro-competitive market forces"); *DeLong Equip. Co. v. Wash. Mills Abrasive Co.*, 887 F.2d 1499, 1505 (11th Cir. 1989) (same).

Here, the evidence contains no record of a single act by Dentsply within the limitations period that caused harm to Universal. The hearsay testimony of plaintiffs' principals, which is based on vague and distant memories of conversations with third parties and gives no clear indication of why or when dealers terminated Universal, is neither admissible nor probative of Dentsply's conduct. There is admissible, reliable evidence of only three Dentsply acts that plaintiffs claim unlawfully injured Universal: the enforcement of Dealer Criterion 6 against DLDS and the swaps with Guggenheim and Benco. It is undisputed that all occurred outside the limitations period. Moreover, the dealer swaps were not unlawful activity, and none of these three instances caused antitrust injury to Uni Lac.

**B.    Plaintiffs' claims are time-barred.**

The statute of limitations for Sherman Act claims, as set forth in the Clayton Act, is four years. 15 U.S.C. § 15b; *Pa. Dental Ass'n v. Med. Serv. Ass'n*, 815 F.2d 270, 277-78 (3d Cir. 1987). This limitations period may be tolled for litigants in a private right of action when the United States files suit seeking to enforce the federal antitrust laws. When this occurs, the tolling period encompasses the pendency of the government litigation and expires one year after its conclusion. 15

-21-

U.S.C. § 16(i). The tolling provision, however, applies only to actions "based in whole or in part on any matter complained of" in the government litigation. *Id.*

Here, the United States filed suit against Dentsply on January 5, 1999, and a Final Judgment was entered by the District Court on April 26, 2006. SMF 44, 50. Since Univac and Lactona filed their complaints on March 15, 2007, and April 25, 2007, respectively, plaintiffs assert that their claims are timely because they were asserted before the expiration of the tolling period.

However, plaintiffs' argument misses the underlying flaw in their analysis. The tolling period is immaterial, because plaintiffs' claims were already stale when the tolling period began—i.e., on January 5, 1999, when the government filed its lawsuit. For plaintiffs' tolled claims to survive the four-year Sherman Act statute of limitations, plaintiffs' cause of action must have accrued on or after January 5, 1995. For plaintiffs' non-tolled claims to survive the statute of limitations, Univac's cause of action must have accrued on or after March 15, 2003, and Lactona's cause of action must have accrued on or after April 25, 2003. There is no evidence in the record, however, that would support a finding that plaintiffs' cause of action accrued after these dates. Indeed, plaintiffs considered suing Dentsply as early as 1994.

Similarly, the most generous statute of limitations potentially applicable to Univac's Pennsylvania law claims, which were not tolled by the government

action, is six years, requiring Univac's cause of action to have accrued on or after March 15, 2001. There is no evidence to support such a finding, and indeed, Univac exited the tooth business entirely in 2001.

### 1.    Plaintiffs' Section 2 claims arising out of Dentsply's exclusivity policy are time-barred.

Plaintiffs complain that they were injured by Dealer Criterion 6, which prohibited Dentsply dealers from adding further competitive lines of teeth (but not from continuing to carry competitive lines already in place at the time Dealer Criterion 6 was issued). Dealer Criterion 6, however, was issued in February 1993—well outside the Sherman Act limitations period noted above. SMF 22.

Dentsply is not aware of any instance after January 5, 1995, in which Dentsply enforced Dealer Criterion 6, or otherwise took any action with respect to the Dealer Criterion 6, to plaintiffs' detriment, and plaintiffs cannot identify any. SMF 32. Indeed, there is evidence of only one occasion on which Dentsply enforced Dealer Criterion 6 to prevent a Dentsply dealer from adding Universal teeth: in 1994, when DLDS abandoned its nascent bid to carry Universal teeth when informed that it was in violation of Dealer Criterion 6. SMF 26. Again, this incident is outside the limitations period.

Plaintiffs may not simply rely on the fact that Dealer Criterion 6 remained in effect during the limitations period. Under the antitrust laws, a cause of action accrues, and the statute of limitations begins to run, "when a defendant commits an

act that injures a plaintiff's business." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971). Although an exception to this rule has been recognized for "continuing violations," no such exception is applicable here.

The Supreme Court articulated the "continuing violations" exception in *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481 (1968). The plaintiff, a shoe manufacturer, alleged that the defendant, a manufacturer and distributor of shoe manufacturing machinery, monopolized the shoe manufacturing machinery market, in part by leasing and refusing to sell its more sophisticated machinery. The plaintiff alleged as damages the difference between the price it paid to lease the machinery and the price it would have paid to purchase the machinery had it been available for sale.

The defendant contended that the lawsuit was time-barred, because its lease-only policy had been existence for more than 50 years. The Court disagreed, holding, in a footnote, that "[w]e are not dealing with a violation which, if it occurs at all, must occur within some specific and limited time span. . . . Rather, we are dealing with conduct which constituted a continuing violation of the Sherman Act and which inflicted continuing and accumulating harm on Hanover." *Id.* at 502 n.15.

The "continuing and accumulating harm" in *Hanover* occurred every time the plaintiff rented the machinery that it should have been permitted to purchase.

-24-

Since Universal was a competitor, however, rather than a purchaser, plaintiffs cannot show such "continuing and accumulating harm." Unlike the plaintiff in Hanover, plaintiffs cannot point to any action Dentsply took with respect to Dealer Criterion 6 after 1994 that harmed Universal. At most, plaintiffs can show only that the 1993 imposition of Dealer Criterion 6—and the 1994 enforcement of Dealer Criterion 6 to prevent DLDS from carrying Universal teeth--had continued adverse impact on plaintiffs.

Such adverse impact, however, is not the same as a continuing injury that would restart the limitations period. The Third Circuit has recognized that the statute of limitations does not restart despite prolonged economic effects where the first overt act was "final at its impact . . . or where an actionable wrong is by its nature permanent at initiation without further acts." *See Harold Friedman Inc. v. Thorofare Markets Inc.*, 587 F.2d 127, 139 (3d Cir. 1978)(internal citation omitted).

Similarly, the Sixth Circuit has held that "the focus is on the timing of the causes of injury, i.e., the defendant's overt acts, as opposed to the effects of the overt acts." *DXS, Inc. v. Siemens Med. Sys., Inc.*, 100 F.3d 462, 467 (6th Cir. 1996) (citation omitted). Consequently, "[a]cts that simply reflect or implement a prior refusal to deal, . . . or acts that are merely 'unabated inertial consequences' (of a single act) . . . do not restart the statute of limitations." *Id.* at 467-68. *See*

*also Aurora Enters., Inc. v. Nat'l Broad. Co.*, 688 F.2d 689, 694 (9th Cir. 1982) ("mere fact that defendants receive a benefit today as a result of a [coerced] contract executed in 1966" insufficient to restart statute of limitations; "[a]ny other holding would destroy the function of the statute, since parties may continue indefinitely to receive some benefit as a result of an illegal act performed in the distant past"). Thus, to the extent that plaintiffs claim injury simply because Dealer Criterion 6, instituted outside the limitations period, was not changed during the limitations period, plaintiffs' claim is time-barred.

### 2. Plaintiffs' Section 2 claims arising out of Dentsply's practices other than exclusivity are time-barred.

In addition to Dealer Criterion 6, plaintiffs complain about two other practices of Dentsply: (i) dealer "swaps," in which Dentsply occasionally obtained a dealer's inventory of a competing line of teeth in exchange for Dentsply teeth, and (ii) economic incentives, such as rebates and discounts, to encourage Dentsply dealers to drop competing lines of teeth and become exclusive Dentsply dealers. SMF 53. These claims were not tolled by the government litigation and, in any event, did not accrue on or after January 5, 1995.

### a. The claims were not tolled by the government litigation.

The four-year statute of limitations for Sherman Act claims, as set forth in the Clayton Act, is tolled by government litigation only as to actions "based in

whole or in part on any matter complained of" in the government litigation. 15 U.S.C. § 16(i). To the extent an action is not based on matters complained of in the government litigation, the statute of limitations is not tolled.

"For the tolling provision to apply, the private plaintiffs must prove, by 'comparison of the two complaints on their face[s],' a significant overlap of subject matter between the two actions." *Novell, Inc. v. Microsoft Corp.*, 505 F.3d 302, 320 (4th Cir. 2007) (quoting *Leh v. Gen. Petroleum Corp.*, 382 U.S. 54, 65 (1965)). In *Novell*, the plaintiff alleged that the defendant's anticompetitive conduct injured the office-productivity-applications market. 505 F.3d at 320. The plaintiff argued that the statute of limitations had been tolled by government litigation alleging that the same conduct had injured the personal computer operating system and Internet browser markets. *Id.* at 321. Even though the government complaint had specifically alleged (i) exclusionary agreements precluding companies from trading in the products of the defendant's software competitors and (ii) that the defendant's conduct in the browser market had the "purpose and effect of maintaining its PC operating-system monopoly and extending that monopoly to other related markets," *id.*, the court held that the two complaints did not sufficiently overlap to toll the statute of limitations:

> The DOJ complaint only expressly alleges harm to the markets for PC operating systems and for Internet browsers. Novell's allegations of harm to the office-productivity-applications market, therefore, overlap little with the subject matter of the DOJ complaint.

-27-

*Id.* The court added:

> On these facts, we do not believe §5(i) of the Clayton Act should be construed to permit private plaintiffs to "sit on their rights" and to assert, years after the traditional statute of limitations has run, claims so much broader than those asserted by the government that they open entirely new vistas of litigation.

*Id.* at 322 (internal quotation marks omitted).

A comparison of the DOJ complaint and plaintiffs' complaints reveals that the latter seek to open precisely the "entirely new vistas of litigation" the court warned against in *Novell*. The government's complaint focused entirely on Dentsply's exclusivity policy. The government complained that "Dentsply has threatened to refuse to sell teeth and other merchandise to dealers if they add certain lines of competing teeth, and on the rare occasions when a dealer has dared to offer the lines in question, has carried out its threat and terminated the dealer." SMF (DOJ Compl. at 1). Nowhere did the government's complaint mention swaps or rebates.

Similarly, both the District Court opinion entering judgment for Dentsply and the Court of Appeals opinion reversing the judgment addressed only Dentsply's exclusivity policy. SMF 51. Neither opinion even mentioned dealer swaps or rebates, because they were not part of the government action. Accordingly, the tolling provision does not apply to this aspect of plaintiffs' claims.

Because the tolling provision does not apply, dealer swaps and rebates can be actionable offenses only if they occurred on or after March 15, 2003—four years before Univac became the first of the two plaintiffs to initiate this action. No such offense can possibly have injured plaintiffs, however, because Lactona exited the tooth business when Uni Lac split in 1997, and Univac exited the tooth business two years when it sold the Universal line in 2001. SMF 11. Therefore, to the extent that plaintiffs' Section 2 claims arise out of any dealer swaps or rebates, they are barred by the statute of limitations.

**b.    Even if the claims were tolled by the government litigation, they are still time-barred.**

Even if plaintiffs' Secton 2 claims with respect to dealer swaps and rebates were tolled by the government litigation, plaintiffs would still be required, as with their claims arising out of Dentsply's exclusivity policy, to demonstrate that their cause of action accrued on or after January 5, 1995—four years before the government filed its action. Plaintiffs cannot make such a showing.

The evidentiary record reflects only two dealer swaps in which Dentsply exchanged its own teeth with a dealer for Universal teeth: the 1990 swap with Guggenheim and the 1993 swap with Benco. SMF 37. Both of these exchanges occurred well outside the limitations period.

The record is even thinner with respect to rebates. While Dentsply's Dealer Growth Incentive Program did offer opportunities for additional growth rebates to

Dentsply dealers who eliminated competing lines of teeth, there is no evidence that this incentive program induced any dealer to cease carrying Universal teeth—let alone within the limitations period. Regardless of whether the government litigation tolled the statute of limitations with respect to the non-exclusivity claims, all such claims are time-barred.

### 3.    Univac's Pennsylvania law claims are time-barred.

The most conservative statute of limitations potentially applicable to Univac's Pennsylvania law claim is six years, under Pennsylvania's "catch all" provision for causes of action with no specified limitations period. 42 Pa. C.S. § 5527(b).[1] Because the tolling provision available under the Clayton Act is not available to Univac's Pennsylvania law claims, Univac's Pennsylvania cause of action must have accrued on or after March 15, 2001. Uni Lac sold Universal and exited the tooth business in 2001, and there is no evidence that Dentsply committed any of the acts complained of on or after March 15, 2001.

---

[1] Other candidates would be a two-year and a four-year statute of limitations. Actions that involve "negligent, intentional, or otherwise tortious conduct" are subject to a two-year statute of limitations. 42 Pa. C.S. §5524(7). Other precedent directs application of the limitations period for a statutory cause of action that most closely analogizes the common law claims, which here would be the four-year limitations period of the Sherman Act. *Gabriel v. O'Hara*, 534 A.2d 488 (Pa. Super. Ct. 1987).

C.    **Dentsply's exclusivity policy did not cause antitrust injury to plaintiffs.**

In addition to proving an injury to business or property causally linked to an antitrust violation, a plaintiff bringing an action under Section 4 of the Clayton Act must also show "antitrust injury," that is, "injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). Such a heightened standard is required because the relevant antitrust laws "were enacted for 'the protection of competition not competitors.'" *Id.* at 488 (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962)).

The Third Circuit held that Dealer Criterion 6 injured competition by foreclosing a significant portion of the market to Dentsply's competitors. SMF 48. Dealer Criterion 6 did *not*, however, foreclose a significant portion of the market to Universal. In exclusive dealing arrangements, "[c]ourts routinely observe that 'foreclosure levels are unlikely to be of concern where they are less than 30 or 40 percent.'" *B&H Med., L.L.C. v. ABP Admin., Inc.*, 526 F.3d 257, 266 (6th Cir. 2008) (quoting *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 68 (1st Cir. 2004); *see also United States v. Microsoft Corp.*, 87 F. Supp. 2d 30, 52-53 (D.D.C. 2000), (foreclosure rate of "roughly forty percent"

-31-

required before exclusive contract raises competitive concerns), *rev'd in part on other grounds, aff'd in part, & remanded in part*, 253 F.3d 34 (D.C. Cir. 2001).

In 1994, less than 23 percent *of Dentsply's own sales* were to dealers into which Universal teeth had not been grandfathered. SMF 28. Universal was free to compete for the remaining 77 percent (including Patterson and Zahn, by far the two largest dealers), as well as non-Dentsply dealers and direct sales. SMF 28. The non-grandfathered dealers, by definition, were dealers without whose business Universal had survived for more than 70 years. While Dealer Criterion 6 may have substantially foreclosed Dentsply dealers to relatively new competitors such as Vita and Ivoclar, they generally were not foreclosed to Universal. Additionally, Universal was not limited to continuing its existing sales to these dealers; nothing in Dealer Criterion 6 prohibited Dentsply dealers from increasing their stocks of "grandfathered" Universal teeth. SMF 31.

Moreover, there is evidence of only one Dentsply dealer that Universal would have been able to supply but for Dealer Criterion 6: DLDS, which accounted for approximately 2.5 percent of Dentsply's Trubyte Division sales in 1994. SMF 27. No reasonable finder of fact could conclude that the loss of a single, small potential customer impeded Universal's ability to compete in the tooth market.

**D.**    **Dentsply's dealer swaps and incentive rebates did not violate Section 2 of the Sherman Act.**

Plaintiffs also complain about (i) Dentsply dealer swaps, in which Dentsply acquired a dealer's inventory of one or more competitors' teeth in exchange for Dentsply teeth, and (ii) Dentsply's incentive rebate program, in which additional rebates were offered to dealers that chose to be exclusive Dentsply dealers. Neither of these activities violated Section 2 of the Sherman Act.

Although Dentsply frequently exchanged tooth inventories with laboratories as part of the laboratories' conversion to Dentsply, swaps at the dealer level were rare. SMF 34. Indeed, the record reflects only two swaps in which Universal teeth were involved: the 1990 Guggenheim swap and the 1993 Benco swap. SMF 37.

Swaps were frequently initiated at the behest of a dealer or laboratory that wanted to sell Dentsply teeth but sought quick disposal of, and some financial return on, an existing inventory of a competing line of teeth. SMF 36. As part of the conversion, Dentsply would agree to acquire the competing inventory in exchange for an equal value of Dentsply teeth. SMF 35. However, as a condition of the swap, Dentsply typically would require the laboratory or dealer to place an upfront order for an additional quantity of Dentsply teeth. SMF 35.

There is no evidence in the record as to which party initiated the Dentsply-Guggenheim and Dentsply-Benco swaps, and there is no evidence that Dentsply provided any economic incentive to Guggenheim, Benco, or any other dealer to

-33-

perform the swaps. The swaps in no way violate Section 2, and in no way derive from Dentsply's power in the tooth market. Any tooth manufacturer in the process of converting a dealer's stock could have facilitated the conversion through a similar exchange, and at the laboratory level, many competing manufacturers engaged in precisely this practice. SMF 36.

Neither was Dentsply's rebate program, which amounted to a loyalty discount for exclusive Dentsply dealers, a violation of Section 2. While a handful of courts have held particular loyalty discounts, on their facts, to violate Section 2, the scope and effect of those discounts was far greater than in this case. Here, the evidence shows that Dentsply's rebates were very small, and there is no evidence that Dentsply's rebate program induced a single dealer to become exclusive—let alone that the program caused any dealer to drop Universal teeth.

In *LePage's Inc. v. 3M*, 324 F.3d 141 (3d Cir. 2003), the Third Circuit struck down a program that offered customers bundled rebates for volume purchases spanning six diverse product lines. *Id.* at 154. The court characterized the rebates as "considerable," noting that several customers received six-figure annual rebates and one received in excess of $1.5 million. *Id.* The court found that the real evil of the *LePage's* program, however, lay in its bundled nature, which took advantage of the defendant's diverse line of product offerings at the expense of smaller, more focused competitors:

-34-

> The principal anticompetitive effect of bundled rebates as offered by 3M is that when offered by a monopolist they may foreclose portions of the market to a potential competitor who does not manufacture an equally diverse group of products and who therefore cannot make a comparable offer.

*Id.* at 155. No such bundling is present here. Moreover, in *LePage's,* there was evidence that most customers had indeed diverted business to the defendant in order to obtain the maximum rebates, and that many distributors dropped the plaintiff's product entirely. *Id.* at 160-61. There is no evidence that any Dentsply dealer dropped Universal, or any other manufacturer, in order to obtain the additional Dentsply rebate for being exclusive.

In *Xerox Corp. v. Media Sciences International, Inc.*, 511 F. Supp. 2d 372 (S.D.N.Y. 2007), the counterclaim plaintiff alleged that the counterclaim defendant offered loyalty rebates to customers who agreed not to sell the plaintiff's competing product. The court recognized that the plaintiff was required to show "a substantial foreclosure of competition" in the relevant market. *Id.* at 389. The court denied the defendant's motion to dismiss only because it found that the plaintiff had "adequately alleged that Xerox's loyalty rebates foreclosed a substantial share of the market, preventing MS from reaching the market with its replacement solid ink sticks." *Id.* at 390. Again, there is no evidence here that any customer, let

alone a substantial share of the tooth market, dropped any manufacturer as a result of Dentsply's rebate program. Moreover, as noted above, Uni Lac was not foreclosed, as the two largest tooth dealers continued to carry Universal teeth.

This is not the rare case in which a loyalty rebate violates Section 2. The additional rebate awarded to exclusive dealers was either 0.5 percent or 1 percent of the dealer's annual sales, depending on the growth target reached. SMF 40. The largest exclusive Trubyte dealer in 1994, DLDS, purchased approximately $1.1 million in teeth and merchandise from Dentsply (SMF 27); even allowing for generous resale margins, the additional rebate to DLDS for exclusivity could not have approached six figures.

There is no evidence that such a minuscule rebate could reasonably have prevented other manufacturers from competing for additional sales to Dentsply dealers, and indeed, it is undisputed that the rebate program had no effect on any dealer's purchases. SMF 43. Zahn, which purchased more than $10 million from the Trubyte Divison in 1995 and would have been in a position to obtain a much larger rebates, saw more value in declining to become exclusive. SMF 42. No reasonable finder of fact could conclude that the loyalty rebate had any exclusionary effect on the tooth market, let alone an effect that harmed Universal.

## VI.    CONCLUSION

For the reasons set forth herein, Dentsply respectfully requests that its motion for summary judgment be granted.

Respectfully Submitted,


/s/ Melissa H. Maxman
Melissa H. Maxman (PA58009)
Ronald F. Wick *(pro hac vice)*
BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5304
202.861.1500
202.861.1783 FAX

Counsel for Defendant Dentsply
International, Inc.

-37-

## CERTIFICATE OF WORD COUNT

I hereby certify, pursuant to Local Civil Rule 7.8(b)(2), that the foregoing Brief in Support of Defendant Dentsply International, Inc.'s Motion for Summary Judgment contains 8,302 words.

s/ Melissa H. Maxman
Melissa H. Maxman