**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNIVAC DENTAL COMPANY, and** | : | **CIVIL ACTION NO.** |
| **LACTONA CORPORATION,** | : | **1:07-CV-493** |
| | : | |
| **Consolidated Plaintiffs,** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **DENTSPLY INTERNATIONAL, INC.** | : | |
| | : | |
| **Defendant.** | : | |

**REPORT AND RECOMMENDATION**

## I.      INTRODUCTION

This case is an antitrust action brought by two dental supply manufacturers, Univac Dental Company ("Univac") and Lactona Corporation ("Lactona"), against Dentsply International Inc., ("Dentsply") a major supplier of dentures throughout the United States. In this action, Univac and Lactona allege that over a span of many years Dentsply engaged in anti-competitive practices which caused them significant financial harm. The plaintiffs, therefore, seek damages from Dentsply as a remedy for these alleged antitrust violations.

This case comes before the Court on motions for summary judgment filed by all parties. The motions raise separate, but related, legal and factual issues and underscore for us a fundamental truth in this particular litigation–in this case we most assuredly do not write upon a blank slate.

Quite the contrary, the allegedly anti-competitive effects of Dentsply's business practices have already been the subject of extensive litigation by both the plaintiffs and the United States, before this court, see Univac Dental Co. v. Dentsply International Inc., No. 07-493, 2008 WL 2486134 (M.D. Pa. June 17, 2008), before the United States District Court for the District of Delaware, see United States v. Dentsply International Inc., 277 F. Supp.2d. 387 (D. Del. 2003),  and before the United States Court of Appeals for the Third Circuit. See United States v. Dentsply International Inc., 399 F.3d 181 (3d Cir. 2005). These prior rulings have thoroughly examined Dentsply's business practices spanning many decades, and have assessed whether, and to what extent, these practices violated federal antitrust laws. This extensive prior litigation, which itself spans some ten years, now shapes and informs the future course of this lawsuit.

The task presented to us in these two motions for summary judgment is to recommend how the past shapes the future, and specifically how this past litigation now shapes the future course of the instant case. Thus, the summary judgment motion of the plaintiffs invites us to examine the heavily annotated prior slate of this case and determine what there is left to say, and decide, in this lawsuit. Specifically, the plaintiffs invite this Court to determine the extent to which the doctrine of issue preclusion permits issues joined between these parties to be determined as a matter

of law based upon the prior antitrust litigation brought by the United States against Dentsply.

Dentsply's summary judgment motion, in turn, urges us to find that the writing on this slate is too old and too indistinct to be read. Thus, Dentsply seeks to invoke the bar of the statute of limitations, and invites us to find as a matter of law that this action is now time-barred.

For the reasons set forth below, we recommend that the Court find that, while much has been written on the slate in this case, there are still meaningful and timely statements which a jury can make here. Specifically, with respect to the plaintiffs' motion for summary judgment we recommend that the Court find that, while the prior litigation has conclusively resolved the legal issue of the anti-competitive nature of Dentsply's past business practices, the plaintiffs must still prove how, and to what extent, they suffered identifiable damages as a result of these practices. Similarly, we recommend that the issue of whether Univac's and Lactona's federal antitrust claims are now time-barred presents questions of fact which must be submitted to a jury at trial.

## II.    STATEMENT OF FACTS AND OF THE CASE

This case presents a story of mouths, money and monopolists, a tale of dentures, dollars and market dominance. The factual background of this case is

thoroughly detailed in the prior opinions of this court, see Univac Dental Co. v. Dentsply International Inc., No. 07-493, 2008 WL 2486134 (M.D. Pa. June 17, 2008), the United States District Court for the District of Delaware, see United States v. Dentsply International Inc., 277 F. Supp.2d. 387 (D. Del. 2003), and the United States Court of Appeals for the Third Circuit. See United States v. Dentsply International Inc., 399 F.3d 181 (3d Cir. 2005). However, briefly the pertinent facts are as follows:

Dentsply International, Inc. is a Delaware Corporation with its principal place of business in York Pennsylvania, which has long manufactured and sold artificial teeth for use in dentures, marketing these artificial teeth to dental product dealers. These dealers, in turn, supply the teeth to dental laboratories, which fabricate dentures for sale to dentists. Because of advances in dental medicine, denture manufacturing is a static industry with a very limited growth potential. Within this narrow and static market Dentsply has long enjoyed a dominant market position. Indeed, the entire industry consists of only 12 to 13 denture manufacturers and Dentsply controls a 75%-80% market share of this specific, closely-defined market, making it 15 times larger than its next closest competitor. In contrast, the plaintiffs, Univac and Lactona, appear to have controlled only a very small fraction of this specialized market, approximately 1% to 2% of the market.

4

For more than fifteen years, beginning in the late 1980's, Dentsply adopted policies that discouraged its dealers from adding competitors' teeth to their lines of products. In 1993, as part of these policies, Dentsply adopted a practice referred to as "Dealer Criterion 6", which provided that in order to effectively promote Dentsply products, authorized dealers were forbidden from including further tooth lines in their product offerings. Because Dentsply operated on a purchase order basis with its distributors, its marketing relationship was essentially terminable at will. Therefore, these marketing practices, coupled with Dentsply's market dominance, gave particular force to Dealer Criterion 6's exclusive marketing requirement.

Dealer Criterion 6 was actively enforced by Dentsply against dealers with the exception of those who had carried competing products before 1993 and were "grandfathered" for sales of those products, and Dentsply rebuffed attempts by those particular distributors to expand their lines of competing products. Moreover, as this Court has previously observed, implicit in Criterion 6 was a threat that Dentsply would terminate its business relationship with any dealer who refused to abide by this exclusive marketing agreement, a threat that "was particularly poignant" given Dentsply's uniquely compelling position in this specialized, and static, market.

In 1999 the Antitrust Division of the United States Department of Justice

brought an action against Dentsply in the United States District Court for District of Delaware, challenging Dentsply's exclusive marketing practices, and alleging that those practices violated the Sherman Act's prohibition on monopolization. By 2003, the district court in Delaware found that Dentsply's business justification for Dealer Criterion 6 was pretextual and designed expressly to exclude its rivals from access to dealers. The Delaware district court nonetheless concluded that other dealers were available in the market and that other marketing methods like direct sales to laboratories were viable methods of reaching the market. Moreover, the district court found that Dentsply had not created a market with anti-competitive pricing, and that dealers were free to leave the network at any time. On the basis of these findings, the Delaware district court held that the Government failed to prove that Dentsply's actions "have been or could be successful in preventing 'new or potential competitors from gaining a foothold in the market.' " United States v. Dentsply International Inc., 277 F. Supp.2d. at 453.  Accordingly, despite recognizing the exclusionary motives that drove Dentsply's marketing practices, the district court concluded that the Government had failed to establish violations of the Clayton Act and the Sherman Act.

The Government appealed this ruling, challenging the premises underlying this decision and arguing that a monopolist, like Dentsply, that prevents rivals from

distributing through established dealers has maintained its monopoly and violated the Sherman Act. In 2005, the Court of Appeals agreed with the Government, reversed the ruling of the district court, held that Dentsply's practices violated the Sherman Act, and directed instead that judgment be entered for the United States on these antitrust claims.

This private antitrust action then followed two years later, in 2007, with Univac and Lactona suing Dentsply for damages arising out of these restrictive and anti-competitive marketing practices. The case now comes before the court on competing, and potentially dispositive, motions for summary judgment. For its part, Dentsply has filed a motion for summary judgment, (Doc. 65) which seeks a finding that the plaintiffs are barred by the applicable statutes of limitations from pursuing either their Sherman Act claims, or their related state law claims. Univac and Lactona, in turn, have moved for partial summary judgment, (Doc. 63) urging this Court to find that Dentsply is precluded by the doctrine of collateral estoppel from contesting a series of matters that were determined by the courts in the prior antitrust litigation brought by the Department of Justice.

These motions are fully briefed, and are now ripe for disposition. For the reasons set forth below, we recommend that Dentsply's motion be granted with respect to the state claims brought by Univac and Lactona, but denied as to the federal

antitrust claims, since there are factual matters which must be resolved as to the timeliness of this action which prevent the entry of a summary judgment in this case. With respect to the plaintiffs' motion for partial summary judgment based upon collateral estoppel, we recommend that this motion be granted, in part, in that Dentsply should be collaterally estopped from disputing the generally anti-competitive nature of its business practices, but Univac and Lactona should still be required to prove that they were harmed in a tangible fashion by these practices. Therefore, to the extent that the plaintiffs seek to invoke the issue preclusion doctrine as to matters beyond the general anti-competitive nature of Dentsply's activities, and attempt to apply that doctrine to specific questions of causation and damages, this motion should be denied.

### III.   DISCUSSION

#### A.   Summary Judgment–Standard of Review

A district court may properly grant a motion for summary judgment when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 ( c ).  The substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome

of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party. Id. at 248-49.

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145-46 (3d Cir. 2004). Once the moving party has shown that there is an absence of evidence to support the nonmoving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006); accord Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. Celotex, 477 U.S. at 322. Summary judgment is also appropriate if the non-moving party provides merely colorable, conclusory, or speculative evidence. Anderson, 477 U.S. at 249. There must be more than a scintilla of evidence supporting the nonmoving party and more than some metaphysical doubt as to the

material facts.  Id. at 252; see also, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In making this determination, the Court must "consider all evidence in the light most favorable to the party opposing the motion."  A.W. v. Jersey City Pub. Schs., 486 F.3d 791, 794 (3d Cir. 2007).

Moreover in this case where the parties have filed competing motions for summary judgment, the court is permitted to resolve these motions concurrently. Inter-Business Bank, N.A. v. First Nat'l Bank of Mifflintown, 318 F. Supp. 2d 230, 235 (M.D. Pa. 2004) (describing concurrent resolution of cross-motions for summary judgment as "a formidable task"); see also Irvin v. United Mine Workers of Am. Health & Ret. Funds, No. 05-1072, 2007 WL 539646, at *1 (W.D. Pa.Feb. 15, 2007); 10A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2720 (3d ed. 1998). When doing so, the court is bound to view the evidence in the light most favorable to the non-moving party with respect to each motion. FED. R. CIV. P. 56; see also Strategic Learning, Inc. v. Wentz, No. 05-467, 2006 WL 3437531, at *4 (M.D. Pa. Nov. 29, 2006).

**B.    Questions of Fact Remain Regarding the Application of the Statute of Limitations to Plaintiffs' Claims.**

Dentsply argues strenuously that Plaintiffs' complaint is time-barred by the four-year statute of limitations applicable to claims brought under the Sherman Act.

15 U.S.C. § 15b; Pa. Dental Ass'n v. Med. Serv. Ass'n, 815 F.2d 270, 277-78 (3d Cir. 1987).  The four-year limitations period may be tolled in a private cause of action when the United States has brought suit to enforce federal antitrust laws.  If such tolling is triggered by government action, the tolling period encompasses the entire pendency of the government litigation and expires one year following the conclusion of that litigation.  15 U.S.C. § 16(I).  The tolling provision is applicable to actions "based in whole or in part on any matter complained of" in the government litigation. Id.

In this case, the United States filed suit against Dentsply on January 5, 1999, and the District of Delaware entered final judgment on April 26, 2006.  (Def. Statement of Material Facts, Doc. 67, ¶¶ 44, 50.)  Plaintiffs Univac and Lactona filed their complaints on March 15, 2007, and April 25, 2007, respectively, which fall within the applicable tolling period.  Nevertheless, Dentsply contends, as an initial matter, that the tolling period has no application to their claims because the claims were stale before the tolling period commenced on January 5, 1999.  Dentsply argues that for either plaintiff's claims to receive the benefit of tolling, the claims must have actually accrued within four years of the government's action, which means the claims must have accrued on or after January 5, 1995.  Because Dentsply views all of Plaintiffs' causes of action as having accrued prior to this time, it argues that none

of the claims was tolled as a result of the government action.

In response, Plaintiffs argue that Dentsply has taken an unreasonably selective – indeed, a misleading – view of the evidence in this case and has ignored evidence from its own records suggesting that Dentsply enforced Dealer Criterion 6 to prevent a dealer from carrying Universal teeth in 1996, which falls within the four-year period preceding the government action, and constitutes evidence of an overt act. (Pl. Counterstatement of Material Facts ¶ 26; Doc. 71, at 2.) Having identified evidence that it claims shows that Dentsply took actions specifically directed at Plaintiff and its business (as well as towards market competition generally) during the tolling period, Plaintiffs contend that Dentsply's argument regarding the statute of limitations should be rejected.

Although the evidence Plaintiffs identify of action Dentsply took specifically with respect to Universal teeth during the tolling period is somewhat limited, particularly when considered in the context of the broad allegations in this case, the considerable factual development in the government litigation, and given the apparent absence of other substantial evidence showing action specifically targeting Plaintiffs' business during the limitations period, we find that Plaintiffs have managed to identify sufficient action, or potential evidence of action, taken during the limitations period that precludes the entry of summary judgment in this case. We disagree with

Dentsply that the evidence identified is inadequate to show that Dentsply took action during the tolling period with respect to a 1996 swap with Darby Dental in which Dentsply obtained Universal teeth from the inventory of Spoor Dental, which Darby had acquired.  Dentsply argues that there is an absence of evidence to show that Dentsply actually took steps to require or pressure Darby into making the swap, but we find that there exists sufficient evidence that would allow an factfinder to make such an inference, and judgment in Dentsply's favor is therefore inappropriate at this time.

Dentsply also argues that Plaintiffs improperly rely upon actions that Dentsply took during the limitations period that concern dealers that did not carry Universal teeth.  Here, Dentsply appears to be arguing that although Plaintiff has identified evidence showing anti-competitive conduct or policies generally, Plaintiff has not identified evidence tending to show that Dentsply's communications with these dealers who did not carry Universal teeth had any specific adverse impact on Universal.  Contending that Plaintiff had sufficient opportunity during discovery to determine whether any such dealers might have sold Universal teeth but for Dentsply's communications, Plaintiffs failed to do so and a factfinder should not "be permitted to conjure up the unlikely possibility of such a dealer in the absence of evidence that one exists." (Doc. 76, at 7.)  Despite Dentsply's protestations in this

regard, upon review, we find that the evidence Plaintiff has identified regarding conduct taken by Dentsply within the limitations period is sufficient to survive summary judgment on statute of limitations grounds.

Relatedly, we also find persuasive Plaintiff's argument that Third Circuit precedent instructs that the Court should not only consider evidence regarding Dentsply's actions directed toward Plaintiffs' specifically, but also the actions that infringed competition in the relevant market generally.  As Plaintiffs note, the Third Circuit made this very point in LePage's, Inc. v. 3M, 324 F.3d 141 (3d Cir. 2003), holding that:

> When a monopolist's actions are designed to prevent one or more new or potential competitors from gaining a foothold in the market by exclusionary, i.e. predatory, conduct, its success in that goal is not only injurious to the potential competitor but also to competition in general.

Id. at 159.  See also United States v. Dentsply Int'l, Inc., 399 F.3d 181, 191 (3d Cir. 2005) (quoting LePage's).

We find that Plaintiffs have sustained their burden of coming forward with evidence to show that Dentsply engaged in anticompetitive conduct during the limitations period, and that Plaintiffs should be permitted to make their case to a factfinder that Dentsply's anticompetitive conduct during this time caused Plaintiffs injury.

In addition to this finding, however, we additionally find that there exists evidence to support Plaintiffs' position that the continuing violations doctrine applies

14

to its claims, and that this provides another reason to conclude that Defendant has failed to demonstrate that Plaintiffs' claims are time-barred.

1.   **The Record Contains Evidence That Would Support a Finding that the Continuing Violations Exception to the Statute of Limitations Applies to Plaintiffs' Claims.**

In addition to arguing that Plaintiffs' claims are stale and accrued outside of the limitations period, Defendants also contend that the record contains no evidence to show that the continuing violations exception operates to save Plaintiffs' claims for statute of limitations purposes.  Plaintiffs counter by arguing that there is evidence in the record that would support a finding that Dentsply engaged in continuing violations of the antitrust laws during the limitations period and that such evidence is sufficient to trigger application of the continuing violations exception and to preclude summary judgment.  Upon consideration of these arguments and review of the evidence identified by the parties, we agree with Plaintiffs that there exists evidence to support a finding that the continuing violations exception to the statute of limitations may have application in this case, and therefore we find that summary judgment in Dentsply's favor on timeliness grounds is unwarranted.

Under federal antitrust law, the statute of limitations initially begins to run "when a defendant commits an act that injures a plaintiff's business." Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 338 (1971).  The Supreme Court has

held, however, that the statute of limitations is subject to a "continuing violations" exception. In order to show that the continuing violations doctrine applies in a case brought under section 2 of the Sherman Act, a plaintiff must show that: (1) the defendant took some overt action to maintain or expand its monopoly power during the limitations period; and (2) the plaintiff suffered injury during the limitations period. In re Lower Lake Erie Iron Ore Antitrust Litig., 998 F.2d 1144, 1173 (3d Cir. 1993); see also Pa. Dental Ass'n v. Med. Serv. Ass'n, 815 F.2d 270, 278 (3d Cir. 1987) ("[E]ach time a plaintiff is injured by a continuing conspiracy to violate the antitrust laws, a new cause of action for damages accrues."). The parties agree on the legal standards but they disagree that the record contains evidence showing that the exception has any application to Plaintiffs' claims.

Against this legal standard, Plaintiffs dispute Dentsply's argument that Plaintiffs have failed to adduce evidence to support a finding that the continuing violations exception has application in this case. First, Plaintiffs note that Dentsply has acknowledged that it enforced Dealer Criterion 6 as late as 2001, and Plaintiffs argue that this fact alone constitutes a continuing violation against Plaintiffs' product. Plaintiffs also argue that Dentsply's ongoing refusal to sell to dealers who stocked competitors' teeth during the limitations period is also sufficient to constitute an "overt act" for tolling purposes. (Doc. 71, at 8) (citing In re Lower Lake Erie Iron

16

Ore Antitrust Litig., 998 F.2d at 1172.)  In general, Plaintiffs argue that the evidence

they have mustered regarding Dentsply's maintenance of its anti-competitive Dealer

Criterion 6 and its policies of refusing to sell to dealers that sold its competitors' teeth

is sufficient evidence to trigger the continuing violations exception to the statute of

limitations.  Dentsply argues that Plaintiffs' position is meritless because Plaintiffs

have failed to identify evidence showing that Dentsply's actions affected Plaintiffs'

product specifically.  In essence, Dentsply insists that Plaintiffs are impermissibly

seeking to rely upon generalities and that they rely improperly – and virtually

exclusively – on the Third Circuit's decision in the government litigation to prop up

its continuing violations argument, while failing to identify evidence specific to

Universal teeth.  We find force to Dentsply's argument, and Dentsply may well

prevail at trial on these arguments when issues of credibility and a weighing of the

evidence occurs, but upon consideration we find summary judgment inappropriate.

As noted above, we find that Plaintiffs have identified at least one instance in

the record where Dentsply acquired Universal teeth from the inventory of Spoor

Dental and, in the context of the entire record, we find that Plaintiffs managed to

identify evidence that, taking all reasonable inferences in Plaintiffs' favor, suggests

that Plaintiffs may have been harmed by Dentsply's anticompetitive conduct during

the limitations period.  Thus, we do not agree entirely that Plaintiffs' have failed to

identify any evidence of harm specific to Universal during this time.  We also find, following review of the parties' competing submissions, that there exists a sufficient dispute of material fact with respect to the effect of Dentsply's conduct upon Universal during the relevant time period so as to preclude summary judgment. Plaintiffs will, of course, bear the burden of proving that the conduct they have identified caused them harm; as we explain elsewhere in this report, Plaintiffs may not simply rely exclusively upon principles of collateral estoppel to prove that Defendant's caused them injury.  But we do not find that Dentsply is entitled to have this matter resolved on summary judgment, but instead find that Plaintiffs' claims should be put to a jury for resolution.

> **2.  Plaintiffs' Federal Antitrust Claims Are Sufficiently Related to the Government Litigation to be Covered By the Tolling Period.**

Dentsply also argues that not all of Plaintiffs' claims should be subject to the tolling period because they are not based in whole or in part on any aspect of the government's litigation against Dentsply.  In contrast, Plaintiffs contend that all of their claims under the Sherman Act should be tolled because, contrary to Dentsply's assertions, the government action was not isolated and discrete, but was instead wide-ranging and extended to conduct that has a bearing on Plaintiffs' claims in this case,

conduct that included using rebates, threatening to withhold its products from non-compliant dealers, engaging in inventory swaps, and refusing to pay cash value on the exchange accounts of terminated dealers.   Plaintiffs also assert that their claims should be subject to tolling even if they are broader in certain respects than those litigated in the government action because the claims are related or based in part on the government litigation.  (Pl. Counterstatement of Material Facts, ¶¶ 44, 46, 50, 51; Doc. 71, at 3.)  In making this argument, Plaintiffs rely on case law showing that the tolling provision is to be applied liberally and does not rely upon strict congruity between the private action and the government action.

As noted previously, the tolling provision applicable to claims under the Sherman Act extends to claims "based in whole or in part on any matter complained of" in the government litigation. 15 U.S.C. § 16(I).  In <u>Leh v. General Petroleum Corporation</u>, 382 U.S. 54 (1965), the Supreme Court interpreted the scope of the tolling provision and concluded that "[t]he private plaintiff is not required to allege that the same means were used to achieve the same objectives of the same conspiracies by the same defendants." <u>Id.</u> at 59.  Moreover, the Court found that it could not "conclude that a private claimant may invoke § 5(b) only if the conspiracy of which he complains has the same breadth and scope in time and participants as the conspiracy described in the government action on which he relies." <u>Id.</u> at 65.

19

Upon consideration of the broad findings reached in the government litigation by both the Third Circuit and the District of Delaware, and comparing them to the allegations made in the instant action, we conclude that Plaintiffs have made a sufficient showing at this stage of the litigation to support a finding that the tolling provision is applicable to its federal antitrust claims even where these claims are broader than those advanced in the government action. At minimum, questions of fact remain regarding the relationship between Plaintiffs' claims and those litigated in the government's action that preclude the entry of summary judgment in Dentsply's favor on any of the claims on statute of limitations grounds.

### C. There Exist Disputed Issues of Fact Regarding Whether Dentsply's Conduct Caused Antitrust Injury to Universal.

As noted above, we find that Plaintiffs have sustained their burden of showing that disputed issues of fact exist with respect to whether Dentsply's policies and conduct caused Universal injury during the limitations period applicable to this case. In reaching that conclusion, we found that there remain disputes as to whether Plaintiffs were, in fact, injured by Dentsply during this time. Our finding in this regard applies equally to Dentsply's separate argument that Plaintiffs failed to identify any evidence that Dealer Criterion 6 caused Plaintiffs any injury. Accordingly, we find that summary judgment is not warranted at this time.

**D.**    **Univac's State-Law Claim is Time-Barred.**

In contrast to the arguments regarding the timeliness of their federal antitrust claims, Univac concedes that it has been unable to identify any legal support for the proposition that the relevant 6-year statute of limitations applicable to its state-law claim was tolled as a result of the government action or otherwise.  For this reason, Plaintiffs represent that Dentsply's motion for summary judgment on this claim is unopposed.  (Doc. 71, at 14 n.10.)  We have likewise been unable to find support for this proposition, and we will accordingly recommend that the Court enter summary judgment in Dentsply's favor on the state-law claim upon the adjudication of all claims in this action.

**E.**    **Dentsply Should be Collaterally Estopped from Re-litigating the Anti-Competitive Nature of its Business Practices, But Univac and Lactona Must Still Prove that They Were Harmed in a Tangible Fashion By These Practices.**

**1.**    **The Plaintiffs' Collateral Estoppel-Issue Preclusion Claims.**

Having determined that the plaintiffs should be entitled, as a factual matter, to try show that they suffered some injury as a result of Dentsply's conduct during the period embraced by the statute of limitations, we now turn to the question of what other matters the plaintiffs must be prepared to prove at trial.

Univac and Lactona have brought this action under Section 2 of the Sherman

Act which provides that:

> Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of [an offense and subject to penalties]

> 15 U.S.C. § 2.

In order to establish a violation of Section 2 of the Sherman Act two elements must be proven: 1) possession of monopoly power and (2) "... maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 480 (1992) (citing United States v. Grinnell Corp., 384 U.S. 563, 571(1966)). United States v. Dentsply Intern., Inc. 399 F.3d at 186.

The Act also provides for relief to private parties, like the plaintiffs, who claim they are aggrieved by monopolistic practices, stating that: "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost

of suit, including a reasonable attorney's fee." 15 U.S.C. § 15.  To sustain its burden of proof in a private antitrust action, however, a plaintiff must do more than merely prove a violation of the Sherman Act. The plaintiff must also link that violation to some tangible, demonstrable harm suffered by a specific party. As the United States Court of Appeals for the Third Circuit has observed: "A plaintiff, . . . , must demonstrate both that the antitrust laws were violated and that it has suffered 'fact of damage' in consequence of that violation in order to establish a cause of action in a private antitrust suit". Pitchford v. PEPI, Inc., 531 F.2d 92, 98 (3d Cir. 1975). Thus, "[i]n order to recover under the antitrust laws, . . ., a plaintiff must, in addition to demonstrating an antitrust violation, prove: (1) a causal relationship between the antitrust violation and the alleged injury, and (2) measurable damage to his business or property." Deaktor v. Fox Grocery Co., 475 F.2d 1112, 1116 (3d Cir. 1973).

In this case Univac and Lactona propose to look to the past to carry their burden of proof in the future on their antitrust claims. Citing the extensive prior history of the antitrust litigation undertaken by the United States in this case; United States v. Dentsply International Inc., 277 F. Supp.2d. 387 (D. Del. 2003); United States v. Dentsply International Inc., 399 F.3d 181 (3d Cir. 2005), and drawing upon the doctrines of issue preclusion and collateral estoppel, Univac and Lactona invite this Court to find that a series of legal issues central to this lawsuit have already been

conclusively determined through this prior litigation.

Indeed, the plaintiffs contend that no less than 29 legal propositions which are pivotal to the outcome of this case have been firmly established by this prior litigation. These previously litigated matters, which Univac and Lactona seeks to have conclusively determined in this case as a matter of law, include threshold issues such as the definition of both the pertinent market and Dentsply's dominant position in that market.   As to these threshold issues, the plaintiffs urge us to find that Dentsply is collaterally estopped from challenging the following findings:

> Finding 1: The "relevant market... is the sale of artificial teeth in the United States both to laboratories and to the dental dealers." Dentsply II, 399 F.3d at 188.

> Finding 2: "Dentsply has long dominated the industry...and enjoys a 75-80% market share on a revenue basis," 67% on a unit basis and is about 15 times larger than its next closest competitor. Id. at 184. "Dentsply's share of the market is more than adequate to establish a prima facie case of power [to exclude]." Id. at 188.

> Finding 3: Dentsply's tooth business has been highly profitable and can be described as a "cash cow" business, one which has "achieved a relatively high market share in a low- or no-growth market." Dentsply I, 277 F. Supp. 2d at 422-23. Dentsply's profits since 1990 increased 32% from $16.8 million to over $22.2 million in 1996. Id. at 423.

Beyond these preliminary, definitional findings, Univac and Lactona also

contend that the prior anti-trust litigation conclusively determined the issue of Dentsply's economic power to exclude competitors in this denture market, and specifically recommend that we find that Dentsply is collaterally estopped from contesting the following findings in this regard:

> Finding 4: "Dentsply has held its dominant share [of the market] for more than ten years and has fought aggressively to maintain that imbalance." Dentsply 11, 399 F.3d at 188.

> Finding 5: "The evidence demonstrated conclusively that Dentsply had supremacy over the dealer network and it was at that crucial point in the distribution chain that monopoly power over the market for artificial teeth was established. The reality in this case is that the firm that ties up the key dealers rules the market." Id. at 190.

> Finding 6: "The reality is that over a period of years, because of Dentsply's domination of dealers, direct sales have not been a practicable alternative for most manufacturers. It has not been so much the competitors' less than enthusiastic efforts at competition that produced paltry results, as it is the blocking of access to the key dealers. This is the part of the real market that is denied to the rivals. The apparent lack of aggressiveness by competitors is not a matter of apathy, but a reflection of the effectiveness of Dentsply's exclusionary policy." Id. at 189.

> Finding 7: On the basis of the foregoing, Dentsply possesses monopoly power in the relevant market. Id. at 187-91.

After asserting that the prior litigation both defined the relevant market, and identified Dentsply as an actor with monopolistic power within this market, Univac

and Lactona then contend that this prior litigation also conclusively determined that Dentsply used its economic power to monopolize the retail denture market in a variety of ways, and specifically urges us to find that the following anti-competitive practices have been conclusively found in the course of this prior litigation:

> Finding 8: "[L]aboratories are driven by the realities of the marketplace to buy far more heavily from dealers than manufacturers." Dentsply II, 399   F.3d at 192. These realities include the fact that dealers offer "beneficial services, credit function, economies of scale and convenience that dealers provide to laboratories, benefits which are otherwise unavailable to them when they buy direct" Id. "The reality in this case is that the firm that ties up the key dealers rules the market." Id. at 190.

> Finding 9: Dealers provide more marketplace exposure and sales representative coverage than manufacturers can generate on their own. Id. at 193. "Using select high-volume dealers, as opposed to directly selling to hundreds if not thousands of laboratories, greatly reduces the manufacturer's distribution costs and credit risks." Id.

> Finding 10: It was not a viable option for Dentsply's competitors to sell directly to dental laboratories. Id. at 193. "The undeniable reality.. .is that dealers have a controlling degree of access to the laboratories," which makes sales to dealers the only practical or feasible distribution channel. Id. The minuscule market shares of Dentsply competitors shows that such  direct sales pose little threat to Dentsply. Id.

> Finding 11: Beginning in at least 1988, Dentsply had in place a policy precluding its dealers from carrying competitive lines of teeth, and it enforced this policy with respect to Frink Dental in 1988 and Zahn Dental that same year. Dentsply 1, 277 F. Supp. 2d at 413-15; see also Dentsply II, 399 F.3d at 185.

Finding 12: The Dentsply policy was put into writing starting in 1993. Dentsply I, 277 F. Supp. 2d at 412. The result of the written policy was that each dealer who did business with Dentsply was governed by a series of dealer criteria the dealer was required to follow. Id. These dealer criteria included a policy, embodied in Dealer Criterion 6, that discouraged Dentsply's dealers from adding competitors' teeth to their lines of products. Dentsply II, 399 F.3d at 185. Dealer Criterion 6 stated: "In order to effectively promote Dentsply/York products, dealers that are recognized as authorized distributors may not add further tooth lines to their product offering." Dentsply 1, 277 F. Supp. 2d at 412.

Finding 13: "By ensuring that the key dealers offer Dentsply teeth either as the only or dominant choice, Dealer Criterion 6 has a significant effect in preserving Dentsply's monopoly." Id. at 191. Dealer Criterion 6 "helps keep sales of competing teeth below the critical level necessary for any rival to pose a real threat to Dentsply's market share. As such, Dealer Criterion 6 is a solid pillar of harm to competition." Id.

Finding 14: Dealer Criterion 6 also had an anticompetitive effect because it limited the choices of products open to dental laboratories, the ultimate users. Id. at 194. Because of Dealer Criterion 6, a "dealer locked into the Dentsply line is unable to heed a request for a different manufacturers' product and, from the standpoint of convenience, that inability to some extent impairs the laboratory's choice in the marketplace." Id.

Finding 15: "In enforcing Dealer Criterion 6, Dentsply has done more than announce its intent to terminate a dealer found to be in violation. It has monitored compliance with the criterion." Dentsply I, 277 F. Supp. 2d at 414-15.

Finding 16: Even though Dentsply was having problems for several months during 2000 supplying teeth to dealers, Dentsply enforced Dealer Criterion 6 against a dealer who attempted to switch to a competitor's teeth. Dentsply I, 277 F. Supp. 2d at 417.

Finding 17: Dentsply's power over the dealers presented significant barriers to entry into the marketplace. Dentsply II, 399 F.3d at 194. It was not "realistic" to conclude that "any new or existing manufacturer may 'steal' a Dentsply dealer by offering a superior product at a lower price" as such efforts "have been thwarted by Dentsply's longtime, vigorous and successful enforcement actions." Id.

Finding 18: "Criterion 6 imposes an 'all-or-nothing' choice on the dealers. The fact that dealers have chosen not to drop Dentsply teeth in favor of a rival's brand demonstrates that they have· acceded to heavy economic pressure." Id. at 196.

Finding 19: The market for artificial teeth is not dynamic or volatile and there are no proven alternative distribution channels. Id.

Finding 20: "Dentsply's grip on its 23 authorized dealers effectively choked off the market for artificial teeth, leaving only a small sliver for competitors." Id.

Finding 21: "Dealer Criterion 6 created a strong economic incentive for dealers to reject competing lines in favor of Dentsply's teeth." Id. at 195. Moreover, Dentsply added certain dealers for the specific purpose of blocking competitors from key distribution points. Id.

Finding 22: "On several occasions, Dentsply has required dealers to drop some, or all, competing tooth brands in order to obtain the Trubyte tooth line in the first place." Dentsply 1, 277 F. Supp. 2d at 413.

Finding 23: There were ten separate incidents detailed by the District Court "in which Dentsply required agreement by new as well as long-standing dealers not to handle competitors' teeth." Dentsply 11, 399 F.3d at 190. This included a situation involving DLDS which "considered adding two other tooth lines because of customers' demand [after which]

Dentsply threatened to sever access not only to the teeth, but to other dental products as well. DLDS yielded to that pressure." Id.

Univac and Lactona then urge this Court to further find that Dentsply is collaterally estopped from contesting that its policies caused economic harm to plaintiffs, arguing that the following direct harms to the plaintiffs have been conclusively established in the prior litigation:

> Finding 24: Universal competed with Dentsply in the sale of artificial teeth in the United States. Dentsply 11, 399 F.3d at 184.

> Finding 25: The inability of Dentsply's competitors to obtain a larger share of the market was attributable more to Dentsply's "blocking of access to the key dealers" through effective exclusionary policies than to its competitors' own business decisions. Id. at 189. "The apparent lack of aggressiveness by [Dentsply's] competitors is not a matter of apathy, but a reflection of the effectiveness of Dentsply's exclusionary policy." Id

> Finding 26: Dealer Criterion 6 ensured that key dealers offered Dentsply teeth either as the only or dominant choice, and thus had "a significant effect in preserving Dentsply's monopoly" by keeping "sales of competing teeth below the critical level necessary for any rival to pose a real threat to Dentsply's market share. As such, Dealer Criterion 6 is a "solid pillar of harm to competition." Id. at 191.

> Finding 27: Dentsply enforced Dealer Criterion 6 specifically to prevent Dentsply's competitors from having access to a dealer network. Id. at 194-195. Because of Dealer Criterion 6, DLDS dropped Universal's teeth when Dentsply threatened to stop supplying its product. Id. at 194.

Finding 28: Dentsply maintained its monopoly anti-competitively

through Dealer Criterion 6 and exercised its monopoly power to prevent competitors, including Universal, from competing effectively. Id. at 191-96.

Finding 29: "Dentsply's alleged justification was pretextual and did not excuse its exclusionary practices." Dentsply II, 399 F.3d at 197. "Dentsply's asserted justifications for its exclusionary policies are inconsistent with its announced reason for the exclusionary policies, its conduct enforcing the policy, its rival suppliers' actions, and dealers' behavior in the marketplace." Id. at 196-97. Dentsply's claimed justification was inconsistent with the evidence establishing that Dentsply's express purpose in enacting and enforcing Dealer Criterion 6 was anticompetitive-to "block competitive distribution points" and "tie up dealers." Id. at 18.

For its part, Dentsply resists Univac and Lactona's efforts to rely upon the past, in this case past litigation, to largely dictate the outcome in the future of this case. Dentsply's opposition to a wide-ranging application of collateral estoppel to this case takes three forms:

First, relying upon Parklane Hosiery Co. v. Shore, 439 U.S. 322, 330 (1979), Denstply invites this Court to exercise its discretion and decline to engage in any affirmative use of collateral estoppel to carry the plaintiff's' burden of proof on any issue in this lawsuit.

Second, while acknowledging that many factual matters in this case have been "conclusively determined" through prior litigation (Doc. 70, page 1), Dentsply insists that "no court has found [] that plaintiffs . . . sustained antitrust injury as a result of

Dentsply's exclusivity policy." (Id.) Accordingly, Dentsply argues that, while collateral estoppel should prevent it from disputing the general antitrust findings made in the prior litigation, the parties should all still be permitted to fully litigate those antitrust injury issues that are specific and unique to Univac and Lactona. Specifically, Dentsply urges this Court to decline to embrace the plaintiffs' invitation to apply issue preclusion to two essential aspects of a private antitrust action; namely, proof of "(1) a causal relationship between the antitrust violation and the alleged injury, and (2) measurable damage to his business or property." Deaktor v. Fox Grocery Co., 475 F.2d 1112, 1116 (3d Cir. 1973).

Finally, Dentsply argues that several specific proposed findings tendered by Univac and Lactona are overly broad and legally inappropriate. (Doc. 70, pages 9-11.)

For the reasons set forth below, it is recommended that the plaintiffs' motion for summary judgment be granted, to the extent that it seeks to preclude relitigation of the general anti-competitive impact of Dentsply's dealer exclusivity policies, but that the doctrine of issue preclusion not be extended to the issues of causation and damages, matters that are unique to the plaintiffs and questions which the parties should be required to fully litigate at trial.

2.      **The Collateral Estoppel-Issue Preclusion Doctrine, the Standard of Review**

Collateral estoppel and issue preclusion are doctrines which play a vital role in litigation. It has long been recognized that "[t]he doctrine[] of . . . collateral estoppel, now . . termed . . . issue preclusion, 'shar[es] the common goals of judicial economy, predictability, and freedom from harassment....' Gregory v. Chehi, 843 F.2d 111, 116 (3d Cir.1988). Generally speaking, the . . . doctrine of issue preclusion, 'precludes the relitigation of an issue that has been put in issue and directly determined adversely to the party against whom the estoppel is asserted.' Melikian v. Corradetti, 791 F.2d 274, 277 (3d Cir.1986)." Electro-Miniatures Corp. v. Wendon Co., Inc. 889 F.2d 41, 44 (3d. Cir.1989)(citations omitted).

The parameters of this doctrine, which precludes relitigation of certain issues, have been aptly defined by the United States Court of Appeals for the Third Circuit in the following terms:

> Issue preclusion, or collateral estoppel, prevents parties from relitigating an issue that has already been actually litigated. "The prerequisites for the application of issue preclusion are satisfied when: '(1) the issue sought to be precluded [is] the same as that involved in the prior action; (2) that issue [was] actually litigated; (3) it [was] determined by a final and valid judgment; and (4) the determination [was] essential to the prior judgment.' " Burlington Northern Railroad Co. v. Hyundai Merch. Marine Co., 63 F.3d 1227, 1231-32 (3d Cir.1995) (quoting In re Graham, 973 F.2d 1089, 1097 (3d Cir.1992)); see also Parklane Hosiery

Co. v. Shore, 439 U.S. 322, 326, n. 5(1979). In its classic form, collateral estoppel also required "mutuality"-i.e., that the parties on both sides of the current proceeding be bound by the judgment in the prior proceeding. Parklane Hosiery, 439 U.S. at 326-27. Under the modern doctrine of non-mutual issue preclusion, however, a litigant may also be estopped from advancing a position that he or she has presented and lost in a prior proceeding against a different adversary. See Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found., 402 U.S. 313, 324 (1971); Parklane Hosiery, 439 U.S. at 329. For . . . non-mutual issue preclusion [] to apply, the party to be precluded must have had a "full and fair" opportunity to litigate the issue in the first action. See Parklane Hosiery, 439 U.S. at 328; Blonder-Tongue Labs., 402 U.S. at 331.

Peloro v. United States, 488 F.3d 163, 174-5 (3d.Cir. 2007).

Questions of collateral estoppel and issue preclusion arise in many contexts in the course litigation. Sometimes the doctrine is advanced defensively as a shield by a party which has already run the gauntlet of litigation on an issue in order to prevent that party from being forced to relitigate a claim upon which it has previously prevailed. In other instances, issue preclusion is wielded offensively as a sword by a party, who seeks to prevent an unsuccessful litigant in a prior lawsuit from asserting claims or defenses which have been previously rejected in some other litigation. While both forms of issue preclusion–defensive and offensive–are clearly recognized by the courts, these two types of issue preclusion are viewed in different lights, and offensive issue preclusion like that sought by the plaintiffs here is given closer scrutiny by the courts.

In this regard, context is important in defining the reach of this doctrine. As the United States Court of Appeals for the Third Circuit explained when applying a more stringent standard of review to offensive issue preclusion rulings:

> Applying different standards of review in these different settings makes sense. The predominant question in preclusion cases involving defensive or mutual collateral estoppel is whether the basic requirements for issue preclusion are satisfied. See Nat'l R.R. Passenger Corp., 288 F.3d at 525 (noting that the equitable exceptions to issue preclusion depend on mutuality of estoppel and whether estoppel is being asserted offensively or defensively). This is a matter of law over which we exercise plenary review. See Szehinskyj, 432 F.3d at 255 ("Application of collateral estoppel is a question of law...."); Resolution Trust Corp. v. Keating, 186 F.3d 1110, 1114 (9th Cir.1999) ("Whether collateral estoppel ... is available to a litigant is a question of law that we review *de novo.*"); Sandberg v. Virginia Bankshares, Inc., 979 F.2d 332, 344 (4th Cir.1993) (reviewing the satisfaction of the basic requirements for issue preclusion de novo); United States v. Sandoz Pharms. Corp., 894 F.2d 825, 826 (6th Cir.1990) (same); Balbirer v. Austin, 790 F.2d 1524, 1526 (11th Cir.1986) ( "[T]his court exercises plenary review over the rules governing collateral estoppel.").
>
> By contrast, the application of non-mutual offensive collateral estoppel presents a unique potential for unfairness because a defendant may have had little incentive to defend the first action vigorously, "particularly if future suits [were] not foreseeable," the judgment relied upon may have been inconsistent with one or more previous judgments in favor of the defendant, or the second action may "afford[ ] the defendant procedural opportunities unavailable in the first action that could readily cause a different result." Parklane Hosiery Co., Inc. v. Shore, 439 U.S. 322, 330-31 (1979). Moreover, the use of non-mutual offensive collateral estoppel "does not promote judicial economy in the same manner as defensive use does" because it creates an incentive for plaintiffs "to adopt a 'wait and see' attitude, in the hope that the first action by another plaintiff will result in a favorable judgment." Id. at 329-30. To address these problems, the Supreme Court concluded that trial courts should have

broad discretion to determine [whether and] when to apply non-mutual offensive collateral estoppel. Id. at 331.

Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc., 458 F.3d 244, 248-9 (3d. Cir. 2006).

While these policy considerations caution in favor of a careful application of the offensive issue preclusion doctrine, this doctrine, which involves an assessment of the overlap between issues presented in separate lawsuits, raises essentially legal questions which are often amenable to resolution by courts through summary judgment. See, e.g., Peloro v. United States, supra; Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc, supra; Witkowski v. Welch, 173 F.3d 192, 198-205 (3d. Cir. 1999); Burlington Northern Railroad Co. v. Hyundai Merchant Marine Co., Ltd.,, 63 F.3d 1227, 1231-9 (3d. Cir. 1995)(summary judgment, offensive issue preclusion). However, while it is well-settled that issues of collateral estoppel and issue preclusion are uniquely capable of being resolved as a matter of law through summary judgment, there is one important caveat to this rule. In all instances, we must abide by "this court's admonition that '[r]easonable doubt as to what was decided by a prior judgment should be resolved against using it as an estoppel,' Kauffman v. Moss, 420 F.2d 1270, 1274 (3d Cir.1970)." Gregory v. Chehi, 843 F.2d 111, 121 (3d. Cir. 1988).

3.    **Application of the Doctrine of Offensive Non-Mutual Collateral Estoppel is Appropriate as to Some Issues in this Case.**

At the outset, in considering these legal standards which govern the application of the issue preclusion doctrine to this case, we turn first to Dentsply's invitation that the Court should exercise its discretion under Parklane Hosiery, and completely decline to apply this doctrine here. While Parklane Hosiery suggests that this Court may in the exercise of its discretion decline to endorse any offensive use of this doctrine, it is recommended that the Court exercise that discretion by refusing Dentsply's invitation in this case to entirely eschew use of issue preclusion.

In reaching this recommendation, our views are framed by the important policy considerations which inform the issue preclusion doctrine, and foster its application to civil litigation. For the past century it has been recognized that proper application of the issue preclusion doctrine, whether offensive or defensive, promotes goals which are critical to our system of laws:

> The general principle . . . is that a right, question, or fact distinctly put in issue, and directly determined by a court of competent jurisdiction, as a ground of recovery, cannot be disputed in a subsequent suit between the same parties or their privies; . . ., even if the second suit is for a different cause of action, the right, question, or fact once so determined must, as between the same parties or their privies, be taken as conclusively established, so long as the judgment in the first suit remains unmodified. This general rule is demanded by the very object for which civil courts have been established, which is to secure the

36

peace and repose of society by the settlement of matters capable of judicial determination. Its enforcement is essential to the maintenance of social order; for the aid of judicial tribunals would not be invoked for the vindication of rights of person and property if, as between parties and their privies, conclusiveness did not attend the judgments of such tribunals in respect of all matters properly put in issue and actually determined by them. Southern Pacific R.R. v. United States, 168 U.S. 1, 48-49,(1897).

Burlington Northern R. Co., 63 F.3d at 1232.

These principles apply with particular force to a case such as this, where many of the questions raised in this private antitrust action arise out of the precise business practices which have been thoroughly, comprehensively and fairly litigated in the prior case brought by the United States. In such instances, the use of the offensive issue preclusion doctrine to resolve fully litigated issues as a matter of law has been expressly endorsed by the courts. See, e.g., Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc, supra; Burlington Northern Railroad Co. v. Hyundai Merchant Marine Co., Ltd., supra ( offensive issue preclusion).

Use of this doctrine to narrow and define the remaining issues in this case is particularly appropriate here since it is evident that the parties agree that many of these issues have, in fact, been "conclusively determined" through prior litigation. (Doc. 70, page 1.) Given this acknowledgment by the parties, accepting Dentsply's invitation to completely refuse to address issue preclusion would abandon the

"common goals of judicial economy, predictability, and freedom from harassment," Gregory v. Chehi, 843 F.2d 111, 116 (3d Cir.1988), which lie at the heart of this doctrine. Moreover, a complete refusal to apply issue preclusion would sacrifice these goals without materially advancing the fairness of these proceedings, since many of these issues are, in fact, subject to conclusive determination. Accordingly, it is recommended that the Court reject Dentsply's request to exercise its discretion in a manner which avoids any application of the issue preclusion doctrine to this case.

4.     **Dentsply Should Be Collaterally Estopped from Disputing the Anti-Competitive Nature of its Business Practices, But Univac and Lactona Must Still Prove that They Were Harmed in a Tangible Fashion By These Practices**

While Dentsply should not be allowed to wholly avoid the consequences of this prior litigation in the instant case, the policies which call for a narrow application of this doctrine to offensive non-mutual issue preclusion claims help define the scope of the doctrine's application in this case. In such cases, application of non-mutual offensive collateral estoppel presents a unique potential for unfairness because: (1) a defendant may have had little incentive to defend the first action vigorously, particularly if future suits were not foreseeable; and (2) the use of non-mutual offensive collateral estoppel "does not promote judicial economy in the same manner as defensive use does" because it creates an incentive for plaintiffs to adopt a "wait

and see" attitude, in the hope that the first action by another plaintiff will result in a favorable judgment. Jean Alexander Cosmetics, Inc., 458 F.3d at 248-9. Thus, these considerations enjoin us to apply this doctrine with care and take pains that all "'[r]easonable doubt as to what was decided by a prior judgment should be resolved against using it as an estoppel,' Kauffman v. Moss, 420 F.2d 1270, 1274 (3d Cir.1970)." Gregory v. Chehi, 843 F.2d 111, 121 (3d. Cir. 1988).

With these principles in mind, we begin our analysis by noting the four essential elements which must be found before a party may assert issue preclusion as a bar to relitigation of a particular matter:

> The prerequisites for the application of issue preclusion are satisfied when: "(1) the issue sought to be precluded [is] the same as that involved in the prior action; (2) that issue [was] actually litigated; (3) it [was] determined by a final and valid judgment; and (4) the determination [was] essential to the prior judgment." In re Graham, 973 F.2d 1089, 1097 (3d Cir.1992) ( quoting In re Braen, 900 F.2d 621, 628-29 n. 5 (3d Cir.1979), cert. denied, 498 U.S. 1066(1991)).
>
> Burlington Northern R. Co., 63 F.3d at 1232.

These legal prerequisites, in turn, must then be applied to the issues which are central to this litigation. Those issues first involve the two essential elements of an antitrust claim generally; namely: (1) possession of monopoly power and (2) "... maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." Eastman

Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 480 (1992) (citing United States v. Grinnell Corp., 384 U.S. 563 (1966)). United States v. Dentsply Intern., Inc. 399 F.3d at 186.

Once we consider whether Dentsply is precluded by this prior litigation from contesting the general elements of an antitrust claim, we must then determine whether the prerequisites of issue preclusion are also met with respect to the additional elements a private litigant must show in order to sustain an action for damages under Section 2 of the Sherman Act, which requires that "a plaintiff must, in addition to demonstrating an antitrust violation, prove: (1) a causal relationship between the antitrust violation and the alleged injury, and (2) measurable damage to his business or property." Deaktor v. Fox Grocery Co., 475 F.2d 1112, 1116 (3d Cir. 1973).

Applying the prerequisites of issue preclusion to these legal issues we recommend that the Court find that Dentsply is collaterally estopped from contesting the general elements of an antitrust violation in this case by this prior litigation. Thus, issue preclusion would prevent Dentsply from disputing either the issue of: (1) Dentsply's possession of monopoly power; or (2) the question of Dentsply's conscious maintenance of that power, as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident. United States v. Dentsply Intern., Inc. 399 F.3d at 186.

40

As to these issues, it is clear at the outset that the questions presented in this lawsuit regarding Dentsply's possession and use of monopoly power are the same as the issues involved in the prior antitrust action. Moreover, there can be no doubt that these issues were actually litigated in the prior action and determined by a final and valid judgment. Finally, it is absolutely clear that the finding of an antitrust violation was essential to the prior judgment in the earlier Dentsply antitrust litigation. Therefore, as to these general elements of an antitrust violation, all of the prerequisites to issue preclusion are fully satisfied, and the plaintiffs are entitled to a partial summary judgment in their favor on these previously litigated matters. See, e.g., Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc, supra; Burlington Northern Railroad Co. v. Hyundai Merchant Marine Co., Ltd., supra (offensive issue preclusion).

However, the plaintiffs' ultimate success in this litigation turns on more than proof of these two basic elements. To sustain a private antitrust action "a plaintiff, . . . , must demonstrate both that the antitrust laws were violated and that it has suffered 'fact of damage' in consequence of that violation in order to establish a cause of action in a private antitrust suit," Pitchford v. PEPI, Inc., 531 F.2d at 98, which requires "in addition to demonstrating an antitrust violation, [proof of]: (1) a causal relationship between the antitrust violation and the alleged injury, and (2) measurable

41

damage to his business or property." Deaktor, 475 F.2d at 1116.

As to these additional elements of proof, it is recommended that the Court find that litigation of these issues is not precluded as a matter of law by the prior action. Rather, the parties should be permitted to fully litigate as a matter of fact these questions of causation and damages. In our view, with respect to these matters which are issues that are unique and specific to Univac and Lactona as private litigants, the prerequisites of issue preclusion are not fully met. In particular, we believe that the issues of causation and damages for these particular plaintiffs were not fully litigated in the prior action since these plaintiffs represented only 1% to 2% of the entire market, a small fraction of the overall dental market. United States. v. Dentsply Intern., Inc. 399 F.3d at 184. More fundamentally, it cannot be said that "the determination [of these issues of causation and damages as to these plaintiffs was] essential to the prior judgment", the final prerequisite for issue preclusion. Burlington Northern R. Co., 63 F.3d at 1232. Indeed, quite the contrary, given the demonstrated adverse impact of Dentsply's practices on other, more substantial competitors in this industry, it is apparent that a determination of these issues with respect to the plaintiffs would not have been "essential to the prior judgment" since that prior judgment would independently rest upon the effects of these policies on these other, larger, competitors of Dentsply.

Furthermore, we note that rigid application of collateral estoppel to the specific elements of a private antitrust action may also run afoul of some of the cardinal principles in this field. For example, application of the doctrine to these more specific elements would only be appropriate if Dentsply had a "full and fair" opportunity to litigate the issues of causation and damage with respect to Univac and Lactona in the first action, something which has not been fully demonstrated here. See Parklane Hosiery, 439 U.S. at 328; Blonder-Tongue Labs., 402 U.S. at 331; Peloro v. United States, 488 F.3d 163, 174-5 (3d.Cir. 2007). Furthermore, application of non-mutual offensive collateral estoppel to this case may present a potential for unfairness because, in the context of the original antitrust litigation, Dentsply likely had little incentive to vigorously defend the issues of causation and damages with respect to Univac and Lactona, since the original case against Dentsply turned on other, far more fundamental issues. Jean Alexander Cosmetics, Inc., 458 F.3d at 248-9.

Moreover, applying the issue preclusion doctrine aggressively to all of the elements of this particular private antitrust action could actually foster one of the dangers which courts are urged to avoid in this field. It could create an incentive for plaintiffs to adopt a "wait and see" attitude, in the hope that the first action by another plaintiff will result in a favorable judgment. Jean Alexander Cosmetics, Inc., 458 F.3d at 248-9. This is a genuine issue in this case, where Dentsply raises substantial, and

triable, statute of limitations concerns due to the delay in bringing this action. Finally,

given these substantial questions regarding whether all of the prerequisites and

policies which underlie offensive non-mutual issue preclusion are satisfied here,

granting the plaintiffs summary judgment as to these issues of causation and damages

would ignore the basic precept that all "'[r]easonable doubt as to what was decided

by a prior judgment should be resolved against using it as an estoppel,' Kauffman v.

Moss, 420 F.2d 1270, 1274 (3d Cir.1970)." Gregory v. Chehi, 843 F.2d 111, 121 (3d.

Cir. 1988).[1] Taking all of these factors into consideration we believe that these

causation and damage issues, which are unique to this private damages action and

were not directly addressed in the prior antitrust case, should not be deemed to be

---

[1]We note that Vident v. Dentsply International, Inc., No. 06-1141, 2008 WL
4384124 (C.D.Cal. Aug. 29, 2008), a case cited by the plaintiffs, does not
commend a different result here. In Vident the court found that Dentsply was
precluded from contesting 24 issues, but the district court's opinion does not state
what those issues were. Moreover, we note that Vident may have occupied a
different, and more prominent, place in the relevant market, a factor which would
affect the impact of anti-competitive practices in ways that would alter the
application of issue preclusion rules to that case. Furthermore, the Vident opinion
does not discuss, analyze or address the limitations on offensive non-mutual issue
preclusion which have been recognized by the United States Court of Appeals for
the Third Circuit. Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc., 458 F.3d
244, 248-9 (3d. Cir. 2006). Finally, the Vident opinion simply reflects one
exercise of the court's discretionary authority to apply this doctrine offensively.
See Parklane Hosiery, supra. Our recommendations, in turn, reflect our views
regarding the best-informed exercise of this discretion on the particular facts of
this case

conclusively proven in this case.

Applying these benchmarks, it is recommended that the Court grant the plaintiff's motion for summary judgment, in part, and find that the following matters, which relate to the general elements of an antitrust claim, are conclusively established in this case:

## MARKET DEFINITION

**ONE**: The "relevant market... is the sale of artificial teeth in the United States both to laboratories and to the dental dealers." Dentsply II, 399 F.3d at 188.

**TWO:** "Dentsply has long dominated the industry and enjoys a 75-80% market share on a revenue basis," 67% on a unit basis and is about 15 times larger than its next closest competitor. Id. at 184. "Dentsply's share of the market is more than adequate to establish a prima facie case of power [to exclude]." Id. at 188.

**THREE**: Dentsply's tooth business has been a highly profitable one which has "achieved a relatively high market share in a low- or no-growth  market." Dentsply I, 277 F. Supp. 2d at 422-23. Dentsply's profits since 1990 increased 32% from $16.8 million to over $22.2 million in 1996. Id. at 423.[2]

---

[2]In its proposed finding, Univac characterized this business as a "cash cow". Because this evocative term may have an unintended, and prejudicial, effect before a jury, we have rephrased this finding to avoid any undue prejudice. See F.R. Evid. 403.

## DENTSPLY'S POSITION IN THE MARKET

**FOUR**: "Dentsply has held its dominant share [of the market] for more than ten years and has fought aggressively to maintain that imbalance." Dentsply 11, 399 F.3d at 188.

**FIVE**: "The evidence demonstrated conclusively that Dentsply had supremacy over the dealer network and it was at that crucial point in the distribution chain that monopoly power over the market for artificial teeth was established. The reality in this case is that the firm that ties up the key dealers rules the market." Id. at 190.

**SIX**: "Over a period of years, because of Dentsply's domination of dealers, direct sales have not been a  practicable alternative for most manufacturers. It has not been so much the competitors' less than enthusiastic efforts at competition that produced paltry results, as it is the blocking of access to the key dealers. This is the part of the real market that is denied to the rivals. The apparent lack of aggressiveness by competitors is not a matter of apathy, but a reflection of the effectiveness of Dentsply's exclusionary policy."Id. at 189.

**SEVEN**: On the basis of the foregoing, Dentsply possesses monopoly power in the relevant market. Id. at 187-91.

## DENTSPLY'S BUSINESS PRACTICES

**EIGHT:** "[L]aboratories are driven by the realities of the marketplace to buy far more heavily from dealers than manufacturers." Dentsply II, 399   F.3d at 192. These realities include the fact that dealers offer "beneficial services, credit function, economies of scale and convenience that dealers provide to laboratories, benefits which are otherwise unavailable to them when they buy direct" Id. "The reality in this case is that the firm that ties up the key dealers rules the market." Id. at 190.

**NINE**: Dealers provide more marketplace exposure and sales representative coverage than manufacturers can generate on their own. Id. at 193. "Using select high-volume dealers, as opposed to directly selling to hundreds if not thousands of laboratories, greatly reduces the manufacturer's distribution costs and credit risks." Id.

**TEN**: It was not a viable option for Dentsply's competitors to sell directly to dental laboratories. Id. at 193. "The undeniable reality.. .is that dealers have a controlling degree of access to the laboratories," which makes sales to dealers the only practical or feasible distribution channel. Id. The minuscule market shares of Dentsply competitors shows that such  direct sales pose little threat to Dentsply. Id.

**ELEVEN**:[3] Dentsply put a policy into writing starting in 1993. Dentsply I, 277 F. Supp. 2d at 412. The result of the written policy was that each dealer who did business with Dentsply was governed by a series of dealer criteria the dealer was required to follow. Id. These dealer criteria included a policy, embodied in Dealer Criterion 6, that discouraged Dentsply's dealers from adding competitors' teeth to their lines of products. Dentsply II, 399 F.3d at 185. Dealer Criterion 6 stated: "In order to effectively promote Dentsply/York products, dealers that are recognized as authorized distributors may not add further tooth lines to their product offering."Dentsply 1, 277 F. Supp. 2d at 412.

**TWELVE**: "By ensuring that the key dealers offer Dentsply teeth either as the only or dominant choice, Dealer Criterion 6 has a significant effect in preserving Dentsply's monopoly." Id. at 191. Dealer Criterion

---

[3]The plaintiffs originally proposed a Finding 11 which stated in part as follows: "Beginning in at least 1988, Dentsply had in place a policy precluding its dealers from carrying competitive lines of teeth, and it enforced this policy with respect to Frink Dental in 1988 and Zahn Dental that same year." Dentsply objected to this specific statement, (Doc. 70., page 9) and Univac acknowledges that this finding may be overly broad (Doc. 74, page 13, n.2.) Therefore, it is recommended that this proposed finding not be included among those to be conclusively determined by the Court.

6 "helps keep sales of competing teeth below the critical level necessary for any rival to pose a real threat to Dentsply's market share. As such, Dealer Criterion 6 is a solid pillar of harm to competition." Id.

**THIRTEEN**: Dealer Criterion 6 also had an anticompetitive effect because it limited the choices of products open to dental laboratories, the ultimate users. Id. at 194. Because of Dealer Criterion 6, a "dealer locked into the Dentsply line is unable to heed a request for a different manufacturers' product and, from the standpoint of convenience, that inability to some extent impairs the laboratory's choice in the marketplace." Id.

**FOURTEEN**: "In enforcing Dealer Criterion 6, Dentsply has done more than announce its intent to terminate a dealer found to be in violation. It has monitored compliance with the criterion." Dentsply I, 277 F. Supp. 2d at 414-15.

**FIFTEEN**: Even though Dentsply was having problems for several months during 2000 supplying teeth to dealers, Dentsply enforced Dealer Criterion 6 against a dealer who attempted to switch to a competitor's teeth. Dentsply I, 277 F. Supp. 2d at 417.

**SIXTEEN:** Dentsply's power over the dealers presented significant barriers to entry into the marketplace. Dentsply II, 399 F.3d at 194. It was not "realistic" to conclude that "any new or existing manufacturer may 'steal' a Dentsp1y dealer by offering a superior product at a lower price" as such efforts "have been thwarted by Dentsply's longtime, vigorous and successful enforcement actions." Id.

**SEVENTEEN**: "Criterion 6 imposes an 'all-or-nothing' choice on the dealers. The fact that dealers have chosen not to drop Dentsp1y teeth in favor of a rival's brand demonstrates that they have· acceded to heavy economic pressure." Id. at 196.

**EIGHTEEN**: The market for artificial teeth is not dynamic or volatile and there are no proven alternative distribution channels. Id.

**NINETEEN**: "Dentsply's grip on its 23 authorized dealers effectively choked off the market for artificial teeth, leaving only a small sliver for competitors." Id.

**TWENTY**: "Dealer Criterion 6 created a strong economic incentive for dealers to reject competing lines in favor of Dentsply's teeth." Id. at 195. Moreover, Dentsply added certain dealers for the specific purpose of blocking competitors from key distribution points. Id.

**TWENTY ONE**: "On several occasions, Dentsply has required dealers to drop some, or all, competing tooth brands in order to obtain the Trubyte tooth line in the first place." Dentsply 1, 277 F. Supp. 2d at 413.

**TWENTY TWO**: There were ten separate incidents detailed by the District Court "in which Dentsply required agreement by new as well as long-standing dealers not to handle competitors' teeth." Dentsply II, 399 F.3d at 190. This included a situation involving DLDS which "considered adding two other tooth lines because of customers' demand [after which] Dentsply threatened to sever access not only to the teeth, but to other dental products as well. DLDS yielded to that pressure." Id.

**TWENTY THREE**: Universal competed with Dentsply in the sale of artificial teeth in the United States. Dentsply II, 399 F.3d at 184.

**TWENTY FOUR**:[4] Dealer Criterion 6 ensured that key dealers offered

_____

[4]Univac initially proposed a Finding 25 which was largely repetitive of an earlier finding, Finding 6, but suggested a causal relationship between Dentsply's activities and harm to the plaintiffs, stating as follows:  The inability of Dentsply's competitors to obtain a larger share of the market was attributable more to Dentsply's "blocking of access to the key dealers" through effective exclusionary

Dentsply teeth either as the only or dominant choice, and thus had "a significant effect in preserving Dentsply's monopoly" by keeping "sales of competing teeth below the critical level necessary for any rival to pose a real threat to Dentsply's market share." Id. at 191.

**TWENTY FIVE**: Dentsply enforced Dealer Criterion 6 specifically to prevent access to the dealer network. Id. at 194-195.[5]

**TWENTY SIX**: "Dentsply's alleged business justification did not

---

policies than to its competitors' own business decisions. Id. at 189. "The apparent lack of aggressiveness by [Dentsply's] competitors is not a matter of apathy, but a reflection of the effectiveness of Dentsply's exclusionary policy."Id. Because the finding's references of harms suffered by Dentsply's competitors, following immediately after a finding identifying Universal as a competitor, are redundant, could create confusion regarding issue preclusion, and might suggest a causal link between Dentsply's actions and a specific tangible harm, to the plaintiffs it is recommended that this finding not be adopted.

[5]The original finding proposed by Univac in this respect suggested a causal relationship between Dentsply's activities and harm to the plaintiffs, stating as follows: "Because of Dealer Criterion 6, DLDS dropped Universal's teeth when Dentsply threatened to stop supplying its product. Id. at 194." Consistent with our Report and Recommendation we have deleted this passage from this specific finding and recommend that this particular matter be left to litigation at trial. Univac also tender another proposed finding, Number 28, which similarly suggested a causal relationship between Dentsply's activities and harm to the plaintiffs stating that: "Dentsply maintained its monopoly anti-competitively through Dealer Criterion 6 and exercised its monopoly power to prevent competitors, including Universal, from competing effectively. *Id.* at 191-96." Consistent with our Report and Recommendation we have deleted this passage from this specific finding and recommend that this particular matter be left to litigation at trial.

excuse its exclusionary practices." <u>Dentsply II</u>, 399 F.3d at 197.[6]

Finally, the parties' submissions discuss one other issue which warrants brief mention in connection with the question of issue preclusion. The plaintiffs refer to other allegedly anti-competitive practices by Dentsply regarding swaps and rebates. In its brief responding to the plaintiffs' motion for partial summary judgment, Dentsply asserted that these questions of rebates and swaps were not addressed in the prior litigation and therefore could not be the subject of any issue preclusion. (Doc. 70, page 12-13.) In their reply brief the plaintiffs agreed. (Doc. 74, page 3.) We also agree that litigation of these questions is not precluded by the prior lawsuit.

## IV.   **RECOMMENDATION**

For the reasons set forth above, it is RECOMMENDED that the Court GRANT Dentsply's motion for summary judgment (Doc. 64) with respect to the plaintiffs' state law claims, but DENY this motion with respect to the plaintiffs' federal antitrust claims.

---

[6] Univac's initial proposed Finding 29 also stated that: "Dentsply's alleged justification was pretextual and did not excuse its exclusionary practices" and contained a further detailed description of the policy. In light of the other findings recommended here, this finding seems redundant, and its use of the term pretextual could cause confusion and prejudice. Therefore, it is recommended that this finding not be adopted as proposed by Univac.

It is further RECOMMENDED, that the plaintiffs' motion for partial summary judgment (Doc. 63), be GRANTED, in part, to the extent that Dentsply is precluded from relitigating issues regarding the general anti-competitive nature of its business practices, but DENIED to the extent that Univac and Lactona seek issue preclusion on the questions of damages and causation since the parties must still litigate these questions.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

*S/Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge

Dated: December 30, 2009